**In re DOW CORNING CORPORATION,**
**Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

July 29, 1997.

Barbara J. Houser, David M. Bernick, Dallas, TX, for Dow Corning Corporation.

Lenard M. Parkins, Edward F. Blizzard, Houston, TX, for Official Committee of Tort Claimants.

Ogden N. Lewis, Donald S. Bernstein, Sheryl L. Toby, New York City, for Official Committee of Unsecured Creditors.

Stanley K. Joynes, Randall L. Frank, Richmond, VA, for Proposed Official Committee of Physician Claimants.

James L. Stengel, Richard F. Broude, New York City, for Dow Chemical Company.

Debra D. Mccullough, New York City, for Corning, Inc.

Larry J. Nyhan, James F. Conlan, Chicago, IL, for Baxter Healthcare.

### OPINION ON ESTIMATION, PANEL OF SCIENTIFIC EXPERTS AND COMMON ISSUES TRIAL

ARTHUR J. SPECTOR, Bankruptcy Judge.

## I. Introduction

On February 15, 1996, Dow Corning Corporation (the "Debtor") filed two motions. One was styled a "Motion ... to Estimate the Tort Claims and to Establish Estimation Hearing Procedures". The other was a "Motion for the Appointment of an Independent Panel of Scientific Experts Under Federal Rule of Evidence 706."

The Official Committee of Tort Claimants ("TCC") filed a motion of its own on March 5, 1996. This motion seeks judicial approval of a tort-claims estimation procedure which differs markedly from that proposed by the Debtor. Predictably, each party objected to the other's estimation motion.[1] The TCC also objected to the Debtor's request that a panel of experts be appointed.[2]

The disposition of those motions constitute core proceedings within the jurisdiction of this Court. 28 U.S.C. §§ 1334, § 157(a),

(b)(2)(A) and (B). This Opinion sets forth the Court's findings of fact and conclusions of law. See F.R.Civ.P. 52(a) (incorporated by F.R.Bankr.P. 7052); F.R.Bankr.P. 9014.

## A. Pre-petition History

Dow Corning Corporation, which is the result of a joint venture between The Dow Chemical Company and Corning Glass Works (now Corning, Incorporated), was formed in 1943 for the purpose of developing and producing products based on silicone chemistry. At present, Dow Holdings, Inc. (a wholly owned subsidiary of Dow Chemical) and Corning are the sole shareholders of the Debtor, each owning 50% of the common stock.

Because they are spelled so similarly, "silicone" is frequently mistaken for "silicon." However, silicone is a man-made substance that was discovered shortly before World War II. See Hall v. Baxter Healthcare Corp., 947 F.Supp. 1387, 1401 n. 30 (D.Or.1996); Marcia Angell, M.D., Science on Trial: The Clash of Medical Evidence and the Law in the Breast Implant Case 36 (1996). Silicone is a synthetic polymer (or chain) primarily composed of two of the earth's most common elements, silicon and oxygen. Angell, supra at 36. "[R]epeating silicon and oxygen atoms [are] bonded together" to form the polymer's "backbone." Stuart R. Kerr, III, UV Silicone Release Coatings: State of the Art, Adhesives Age, July 1, 1996. Attached to

---

1. Objections to the Debtor's motion were filed by the Official Committee of Tort Claimants ("TCC") in addition to several law firms representing an aggregate of 588 tort claimants: Doffermyer, Shields, Canfield, Knowles & Devine on behalf of 311 women; Borland and Borland on behalf of 83 women; and Mithoff & Jack, L.L.P. on behalf of 194 women and some of their husbands; Medical Engineering Corp. and Bristol-Myers Squibb Co. (collectively "MEC"); Baxter Healthcare Corp. and Baxter International, Inc. (collectively "Baxter"); Minnesota Mining and Manufacturing Co. ("3M"); the Proposed Official Committee of Physician Claimants ("PCC"); the TMJ Plaintiffs' Steering Committee (an entity arising out of In re TMJ Implants Prods. Liab. Litig., 94–MDL–1001 (D.Minn.)). Concurrences were filed by The Dow Chemical Company and the Official Committee of Unsecured Creditors ("U/S CC").

Objections to the TCC's motion were lodged by the Debtor, the U/S CC, MEC, Dow Chemical,

Blue Cross and Blue Shield of Alabama, et al. A response was filed by a law firm representing Dr. Lawrence E. Wolf and 16 other doctors, and by 3M and the PCC. Concurrences were filed by several law firms representing 2,491 tort claimants: Williams, Blizzard & McCarthy, L.L.P. on behalf of 94 women; O'Quinn, Kerensky, McAninch & Laminack on behalf of 670 women; Mithoff & Jack, L.L.P. on behalf of 194 women and some of their husbands; Fisher, Gallagher & Lewis, L.L.P. on behalf of 1,139 women; Borland & Borland on behalf of 83 women; and Doffermyer, Shields, Canfield, Knowles & Devine on behalf of 311 women.

2. Objections were also filed by the law firms listed in the first paragraph of footnote 1, as well as Stephanie Matthews, in pro per. Concurrences with the motion were filed by Dow Chemical and the U/S CC.

each silicon atom are side chains of hydrogen and carbon. *Id.* By varying the polymer's length and configuration, silicone can be given almost any consistency ranging from liquid to solid. Angell, *supra* at 36. Due to its pliability, as well as its possession of certain other physical characteristics, silicone has proven to be a very versatile product.

The Debtor, along with its subsidiaries, produces thousands of silicone-based products, the great majority of which are directed toward non-medical uses. However, silicone has also been found to be useful in the medical products industry. "Physicians have used silicone products in the human body for various purposes since the 1950s." *Hall v. Baxter Healthcare,* 947 F.Supp. at 1401. Examples of medical devices that contain silicone include various types of implants, artificial joints, heart valves, shunts, disposable needles and implantable contraceptives. *Id.;* Angell, *supra* at 36. The Debtor has either produced, provided component parts for, or supplied raw materials for many of these medical products.[3]

Silicone was first used to enlarge women's breasts shortly after World War II in Japan. The implanted silicone was not contained in a packet, but instead was injected directly into the breast. Angell, *supra* at 35–36. The effects of the direct silicone injections were more often than not disastrous for the women who received them. *Id.* at 36. Typically, these women not only suffered disfigurement but also had to endure extremely painful complications. *Id.* at 38. At the time, silicone was generally considered to be inert inside the human body and was not itself considered to be the problem. *Id.* at 36. Concerns about the possible toxicity of silicone when placed inside the human body did not arise until a much later date.

In 1961, two plastic surgeons, Drs. Thomas Cronin and Frank Gerow, developed the idea of placing silicone gel inside a sealed packet that would then be surgically implanted inside the woman's breasts. *Id.* at 38–39. The doctors collaborated with the Debtor to create implants "consist[ing] of a rubbery silicone envelope containing silicone gel." *Id.* at 39. Despite various innovations and improvements since that time, this is still the basic design of the breast implant. The intent of the design was to eliminate both the migration of silicone throughout the body and the uneven and irritating nature of the scarring that resulted from direct silicone injections. *Id.*

Silicone gel-filled packets were first placed inside a woman for purposes of breast augmentation in 1962. In 1964, the Debtor introduced silicone-gel breast implants to the market. *Id.* They were immediately considered a great improvement over silicone injections. *Id.* at 40. Nonetheless, it has long been known that silicone-gel breast implants can lead to certain problems separate and distinct from any pathogenic effect that they might have. The body's natural reaction to the presence of a foreign body inevitably leads to the formation of scar tissue that encapsulates the invader. Problems can arise when the scar tissue that surrounds the implant contracts. If contracture occurs, the scar tissue squeezes in on the implant, which can cause it to become hard and misshapen. *Id.*

Silicone-gel breast implants have also been shown to leak or "bleed" over time and under certain conditions are susceptible to rupture. The primary concern with both leakage and rupture is that once the silicone escapes the rubbery envelope, it may not stay contained within the encasing scar capsule, thus enabling silicone to escape into the body. *Id.* at 41. Another non-pathogenic problem is that breast implants make it difficult to perform mammographies because they obstruct the passage of x-rays through the breast tissue, *id.* at 42, thereby creating a potential

---

**3.** The percentage of the Debtor's product line devoted to medical products has always been relatively small. For example, according to the Debtor, silicone breast implants never amounted to more than 1% of its sales. *See In re Dow Corning Corp.,* 187 B.R. 919, 921 (E.D.Mich. 1995), *rev'd,* 103 F.3d 129 (6th Cir.1996). While the Debtor owes about a billion dollars to numerous commercial creditors, it is these silicone-containing medical products, particularly silicone-gel breast implants, that have become legally problematic. In fact, there is general consensus that the driving force behind these proceedings was the overwhelming number of silicone-gel breast implant lawsuits filed against the Debtor.

impediment to the early detection of breast cancer. Heidi Li Feldman, *Science and Uncertainty in Mass Exposure Litigation,* 74 Tex. L.Rev. 1, 19 (1995). But through proper manipulation of the breast implant, mammography can still be performed. Angell, *supra* at 42.

Around 1977, a jury awarded a silicone-gel breast implant recipient $170,000 for complications that developed after her implants ruptured. *See V. Mueller & Co. v. Corley,* 570 S.W.2d 140 (Tex.Civ.App.1978); *see also* Deborah R. Hensler and Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio–Legal Analysis,* 59 Brook. L.Rev. 961, 992 (1993). Purportedly, this was the first successful breast implant lawsuit against the Debtor. Package inserts soon began warning implant recipients of the potential non-pathogenic side effects. Angell, *supra* at 42. As a result, complaints about these side effects have never been a source of great legal difficulty for the Debtor.[4]

In the 1980s, a few reports surfaced suggesting that silicone gel may be pathogenic— i.e., that it can cause systemic disease in humans. This period also saw the beginning of a slow trickle of lawsuits alleging that silicone gel leaking from breast implants can cause much more grievous harm to the recipient than the non-pathogenic complications mentioned above. *Id.* at 52. The lawsuits were initially brought by women alleging that silicone gel had caused them to develop an auto-immune connective tissue disease such as lupus, scleroderma or rheumatoid arthritis. Gina Kolata, *A Case of Justice, or a Total Travesty?,* New York Times (June 13, 1995). Ultimately, many lawsuits alleged that the presence of silicone gel in the plaintiff's body resulted in more "general symptoms like aches and pains, fatigue, insomnia, memory loss and headaches." *Id.* The various symptoms proved hard to classify and eventually the term "silicone disease" was coined. *Id.*

The first suit to successfully assert that silicone gel caused connective tissue disease was the 1984 case of Maria Stern, in which the jury awarded the plaintiff a verdict of $2 million. *Stern v. Dow Corning Corp., et al.,* No. C–83–2348–MHP (N.D.Cal.1984); Angell, *supra* at 52. After this lawsuit the Debtor modified its package inserts to include an acknowledgment that there were "reports of suspected immunological responses to silicone mammary implants...." Angell, *supra* at 57. However, the Debtor's new package insert warning also added that "convincing evidence does not exist to support a causal relationship between exposure to silicone materials and the acquisition or exacerbation of a variety of rheumatic and connective tissue disorders." *Id.*

In March of 1992, the Debtor ceased marketing silicone gel for breast implantation. Two months later, the Food and Drug Administration ordered that implants containing the gel be taken off the market. Subsequent to the FDA's action and the attendant publicity, the volume of lawsuits against breast implant manufacturers began to increase dramatically. In 1992, more than 3,000 such suits were commenced against the Debtor. Another 8,000 actions were filed in 1993, followed by 7,000 new cases in 1994. *In re Dow Corning Corp.,* 187 B.R. 919, 921 (E.D.Mich.1995), *rev'd,* 103 F.3d 129 (6th Cir. 1996). Many similar suits were also filed in Canada.

In an attempt to make this crush of lawsuits more manageable, the Judicial Panel on Multidistrict Litigation consolidated those actions pending in federal court for administration pursuant to 28 U.S.C. § 1407. *In re Silicone Gel Breast Implants Prods. Liab. Litig.,* 793 F.Supp. 1098 (Jud.Pan. Mult.Lit.1992). The MDL Panel assigned the cases to the Honorable Sam C. Pointer, Jr. of the Northern District of Alabama.

The purpose of the consolidation was primarily to coordinate pretrial activities. However, as the MDL proceedings progressed, efforts to achieve a global settlement intensi-

---

**4.** As will be discussed later, however, the TCC now proposes to make the Debtor's liability in connection with non-pathogenic side effects, specifically rupture and leakage, the major focus of the estimation process. According to the TCC, the disease issue only needs to be addressed if equity remains in the Debtor corporation after the nondisease claims are valued. For reasons to be discussed later, the Court rejects this proposal.

fied. *Dow Corning,* 187 B.R. at 922. The Debtor maintained then, as it does now, that silicone-gel breast implants do not have the pathogenic effects alleged. *Id.* Nonetheless, the Debtor asserted that it was willing to settle the controversy because of two key factors. First, financial resources needed to continue the legal battle were not unlimited. In 1994 alone, the Debtor allegedly incurred more than $200 million in litigation costs. And absent a resolution to the controversy, legal costs would continue at this level, if not higher, having a potentially crippling effect on the company. *Id.* Second, the conflict was diverting attention of key management personnel away from the company's core business. *Id.*

Months of negotiating between the defendant manufacturers and a court-appointed plaintiffs' steering committee eventually led to a proposed $4,225,070,000 global settlement. *Lindsey v. Dow Corning Corp. (In re Silicone Gel Breast Implant Prods. Liab. Litig.),* No. CV 92–P–10000–S, Civ. A. No. CV94–P–11558–S, 1994 WL 578353, at *1 (N.D.Ala. Sept. 1, 1994). Of this sum, the Debtor agreed to contribute $2.02 billion. *Dow Corning,* 187 B.R. at 922. The proposed settlement, approved by Judge Pointer as fair and equitable on September 9, 1994, has been praised by commentators as a potential model for future mass tort settlement negotiations. *See* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum. L.Rev. 1343, 1404–10 (1995). The praise stems primarily from the way the process brought all the various factions to the negotiating table and because of the openness with which the negotiations were conducted. *Id.* Unfortunately, the global settlement ultimately proved to be unsuccessful.

When the settlement was first announced, potential class members were initially told that, depending upon their injury, they would each receive between $200,000 and $2 million. *Id.* at 1407–08. The payoff estimates were later reduced to a range of $105,000 to $1.4 million. Of course, the amount each claimant would receive was entirely dependent upon an unknown variable—the number of claims actually filed. *Id.* To protect claimants, the settlement agreement provided that class members would have an additional opportunity to opt out if the number of claims actually filed caused the settlement figures to fall below the estimated amounts. *Id.* By the spring of 1995 approximately 440,000 women had filed claims with the global settlement fund, a number much higher than expected.[5] Consequently, the settlement would have provided claimants with only a small percentage, perhaps as little as 5%, of the amount promised. *Id.* at 1408. According to some estimates, the defendant manufacturers would have had to jointly contribute another $24 billion to the settlement fund to pay all claimants the amounts promised. *Id.* at 1409. Not surprisingly, the defendant manufacturers were not interested in increasing their already substantial monetary commitment. At least 15,000 class members chose to opt out of the proposed settlement in order to preserve their right to pursue individual trials. *Dow Corning,* 187 B.R. at 922. The settlement quickly began to unravel and by May, 1995 was essentially dead.

At the same time, approximately 90 state trials were set to begin against the Debtor. *Id.* at 923. Due to the complexity of the issues involved, the Debtor claims that silicone-gel breast implant trials last anywhere from two to eleven weeks, not including the weeks of pretrial preparation necessary for each case. *Id.* at 922. Since many of the

---

**5.** Although the exact number is not known, it is estimated that as many as 2 million women received breast implants. Given this large number of potential plaintiffs, it is somewhat baffling that the parties were so completely caught off guard by the number of claims filed. The settlement amounts promised were substantial and the level of proof required to qualify for some of the disease categories was fairly low. Naturally one would think that such an offer would entice many potential plaintiffs to file a claim when they otherwise would not have done so. Perhaps settlements of this nature would be more successful in the future if, prior to announcing the expected amount of individual damage awards, all claimants were first required to opt in—that is, to register as plaintiffs and to complete some cursory form of injury survey. This would allow the parties and their experts to better estimate the minimum dollar figure each claimant or class of claimants would receive if the claimants chose to remain part of the settlement class. Thereafter the claimants could be given a chance to opt out if they felt the amounts were inadequate.

trial dates were overlapping, the situation facing the Debtor was daunting. *Id.* at 923. According to the Debtor, the possibility of defending itself on so many fronts simultaneously was financially and logistically impossible. Financially, the total cost to litigate each of the pending trials would have been staggering. On the other hand, the Debtor was not willing to "succumb" to what . it thought were "exorbitant settlement demands." *Id.* Logistically, the Debtor felt that it simply could not muster the manpower necessary to effectively defend itself on so many concurrent fronts. Alison Frankel, *Dow Corning Goes For Broke,* The American Lawyer, January/February 1996, at 80. In addition, since the global settlement involving the federal cases was now in shambles the Debtor faced the almost certain prospect that thousands of new lawsuits would soon be filed against it. *Id.* at 79.

As stated above, *supra* p. 550, the Debtor also manufactured or supplied materials for other silicone-containing medical products. A number of lawsuits involving these various nonbreast implant medical products have been asserted against the Debtor as well. The majority of the nonbreast implant lawsuits claim that the products cause injuries similar to those allegedly caused by silicone-gel breast implants. While the nonbreast implant lawsuits are not nearly of the same magnitude or scope as the silicone-gel breast implant lawsuits, they nonetheless served to further complicate the Debtor's already onerous legal situation. In response to what it perceived as an overwhelming legal scenario, the Debtor filed for relief under Chapter 11 on May 15, 1995. As of the petition date, the Debtor was a defendant in over 19,000 individual silicone-gel breast implant lawsuits and at least 45 putative silicone-gel breast implant class actions. *Dow Corning,* 187 B.R. at 922. As for the nonbreast implant medical products, approximately 470 lawsuits, some involving multiple plaintiffs, had been asserted against the Debtor by that time. Pursuant to § 362(a)(1) of the Bankruptcy Code, all legal action against the Debtor has been stayed.

## B. Post-petition History

Since the Debtor filed for chapter 11 bankruptcy relief, several motions have been filed which are relevant to the issue of how to best determine the value of implant claims pending against the Debtor. They are briefly summarized below.

One of the first steps taken by the Debtor after commencing this bankruptcy case was to file a motion seeking to transfer to the Eastern District of Michigan all actions filed by the women who had opted out of the MDL settlement. It sought this relief not only with respect to claims made against itself, but also such claims as were asserted against its two shareholders, Dow Chemical and Corning, Inc.

The District Court granted the motion insofar as it pertained to claims against the Debtor, and extended the reach of the transfer order to include the actions filed by plaintiffs who chose to remain part of the MDL settlement. *See Dow Corning,* 187 B.R. at 919, 934. However, the court declined to transfer the claims against the Debtor's shareholders, reasoning that it had no jurisdiction over those claims. *Id.* at 933; *see also In re Dow Corning Corp.,* 187 B.R. 934 (E.D.Mich.1995) (denying motion by nondebtor breast implant manufacturers to transfer breast implant claims pending against them to the Eastern District of Michigan).

Various parties appealed on the issue of whether the District Court had jurisdiction over breast implant claims pending against nondebtor defendants. The Sixth Circuit reversed, holding that the District Court does have such jurisdiction. *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re Dow Corning Corp.),* 86 F.3d 482, 493–94 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997). The District Court subsequently declined to exercise jurisdiction under abstention principles. *See In re Dow Corning Corp.,* No. 95–CV–72397–DT, 1996 WL 511646 (E.D.Mich. July 30, 1996). The Sixth Circuit reversed that ruling, but only with respect to the Debtor's shareholders. *See Lindsey v. Dow Chemical Co. (In re Dow Corning Corp.),* 113 F.3d 565 (6th Cir.1997), *cert. denied,* —— U.S. ——, 117 S.Ct. 718, 136

L.Ed.2d 636 (1997). The upshot, then, is that all claims which were pending against the Debtor or its shareholders have been (or will be) transferred to the Eastern District of Michigan.

There are two other matters of interest and some relevance. Because of the large number of claims expected to be filed in this case, a special claims filing procedure was established. On August 7, 1996, the Court set a bar date for filing proofs of claim; approved the use of alternative proof of claim forms for filing certain proofs of claim; and approved notice procedures. The extensive notification procedure, which cost $8 million, began with a press conference in Washington D.C. on September 5, 1996, and included press releases, public relations initiatives, television and print advertising, direct mail, targeted mailings to specific interest groups, internet postings, and a toll-free telephone number. The bar date for domestic claimants was fixed at January 15, 1997. Order Regarding Debtor's Renewed Motion For Order (1) Setting Bar Date ... at 3. The bar date for foreign claimants was fixed at February 14, 1997. *Id.*

On April 7, 1997, the Debtor filed an Omnibus Disease Objection to Breast Implant Claims, in which the Debtor seeks disallowance of all personal injury claims asserting that the Debtor's silicone gel caused disease. Its principal objection was that the claimants have no scientific evidence which would show that silicone gel causes illness. In furtherance of that objection, the Debtor contemporaneously filed a Motion for Summary Judgment. In the motion, the Debtor states: "There is not sufficient evidence or expert opinion testimony admissible under the standards set in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, for the claimants to support a finding, by a court or a jury, that it is more likely than not that silicone-gel breast implants have caused any systemic disease, or indeed, that silicone-gel breast implants are even capable of causing systemic disease." Motion for Summary Judgment at 1. The Debtor objected on different grounds to the other personal injury claims. Proceedings on these contested matters have been stayed pending the issuance of this Opinion. Order on Scheduling of Motions Regarding Omnibus Implant Claims, entered May 2, 1997.

## II. The Estimation Motions

The present case is perhaps the first mass tort bankruptcy where liability has been disputed by a debtor. Case law provides little guidance on how to determine the fairest and most efficient way to value the pending personal injury claims. In substantially all of the mass tort bankruptcy cases which preceded this one, the major questions were how much would be needed to satisfy the thousands of tort claims; how best to raise the money; and what would be the best methodology to fairly apportion those funds among the claimants. Most nonbankruptcy mass tort cases are only of moderate help. Recognizing this lack of precedent, the Court has encouraged counsel for the various parties in this case to reach into the depths of their vast experience in both mass torts and bankruptcy to find solutions to the problems now facing them and the Court.

Competing estimation proposals were filed by the Debtor and the TCC. Both proposals are impressive in their originality and creativity and both have some merit. Nonetheless, the Court is denying the motions even though certain components of the movants' proposals have been incorporated into our subsequent recommendations. Before setting forth the reasons for the denial, it will be helpful to summarize the two competing proposals.

### A. Debtor's Proposal

The Debtor asked the Court to "estimate certain mass tort claims pursuant to 28 U.S.C. § 157(b)(2)(B) and 11 U.S.C. §§ 1129 and 502(c) and to establish procedures for the estimation hearing." Debtor's Estimation Motion at 1. The Debtor's proposal is founded upon the following assertions. It claimed that pursuant to 28 U.S.C. § 157(b)(5), this Court lacks the ability to liquidate personal injury claims.[6] However,

6. As explained *infra* pp. 561–562, the conclusion

that a bankruptcy court does not have jurisdic-

the Court does have authority to estimate the mass tort claims for purposes of confirming a plan. Debtor's Estimation Motion at 2. Moreover, "[g]eneral bankruptcy principles ... require" the Court to take such action. [Debtor's] Brief in Support of its Motion to Estimate Tort Claims and to Establish Estimation Hearing Procedures ("Brief in Support of Debtor's Estimation Motion") at 17. The bankruptcy court shall estimate for purposes of allowance, "any contingent or unliquidated claim" when liquidation of that claim "would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). According to the Debtor, "adjudication of the thousands of individual tort claims would substantially delay ... [the Debtor's] reorganization." Brief in Support of Debtor's Estimation Motion at 18. Therefore, "it is necessary and appropriate to estimate the tort claims against the [Debtor] for purposes of confirmation." *Id.* at 17. Only after estimation is complete will the Court be able to properly evaluate and determine whether the Debtor's plan of reorganization is feasible, and thus confirmable pursuant to 11 U.S.C. § 1129. *Id.* at 18.

The procedure which the Debtor proposes for estimation essentially consists of the following steps:

1. **Identify Universe of Breast and Nonbreast Implant Claims**—By a court-ordered bar date for filing proofs of claim.[7]

2. **Designation of Counsel**—Court designation of lead counsel to represent the breast implant claimants during the estimation process. Debtor's Estimation Motion at 3.

3. **Pretrial Management**—Court establishment of a timetable for the estimation process and the entry of any necessary orders under F.R.Bankr.P. 7016. *Id.*

4. **Scientific Panel**—Court appointment of an independent scientific panel of ex-

perts pursuant to Federal Rule of Evidence 706. The panel would engage in an independent review of relevant scientific literature and studies in order to render an impartial and objective assessment of the scientific evidence to the Court. Brief in Support of Debtor's Estimation Motion at 20–21.[8]

5. **Breast Implant Estimation Trial**—Presentation of evidence by both the Debtor and breast implant claimants on the issue of silicone gel's disease-causing potential (the "causation" issue). Only science satisfying the *Daubert*[9] standard would be admissible. *Id.* at 21. Based upon the admissible scientific evidence, the Court would estimate the total aggregate value of all contingent breast implant claims. *Id.* at 20.

6. **Estimation of Nonbreast Implant Claims**—The estimation hearing on nonbreast implant claims would be held immediately following estimation of breast implant claims. In general, discovery and other pretrial matters would run contemporaneously with the pretrial schedule for breast implant estimation. *Id.* at 29. Nonbreast implant estimation would involve: a) identifying the universe of such claims (via the claims bar dates); b) "screening the claims for product identification, limitations, or other deficiencies;" c) presenting scientific evidence on the issue of disease causation; d) statistically identifying and quantifying the "scope of the potentially valid claims;" e) valuing the nonbreast implant claims "by identifying and estimating the cost of the applicable medical procedures involved in remedying the alleged injuries." *Id.*

7. **Confirmation Hearing**—The Debtor would then seek confirmation of its proposed plan of reorganization, a plan that would purportedly pay all allowed claims in full. *Id.* at 22. As part of its plan of

tion to liquidate a personal injury claim is not necessarily correct.

7. The Court set bar dates of January 15, 1997 for domestic claims and February 14, 1997 for foreign claims. *See supra* p. 554.

8. In connection with this request, the Debtor filed a motion entitled [The Debtor's] Motion for

the Appointment of an Independent Panel of Scientific Experts Under Federal Rule of Evidence 706 ("Panel of Experts Motion"). That motion is being decided in Part V., *infra* pp. 574–598, of this Opinion.

9. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

reorganization, the Debtor would reserve the right to hold a single common-issue causation trial before the District Court, seeking disallowance of some or all of the breast implant claims. *Id.* at 22–23. If the Debtor chooses to exercise this right, the trial would either take place immediately following the estimation process, or immediately following plan confirmation but prior to the plan becoming effective. *Id.* at 23.

8. **Claims Resolution Facility**—The plan of reorganization would establish a breast implant claims resolution facility. *Id.* Tort claimants with allowed claims would only be able to recover from one of two trust accounts that would be established as part of the claims resolution facility—a Settlement Trust and a Litigation Trust. Both trust accounts would be funded by the Debtor.[10] The claims resolution facility would provide breast implant claimants with three options on how to pursue their allowed claim. Brief in Support of Debtor's Estimation Motion at 24–25. The options would be distinguished by the type of breast implant claim pursued: 1) local complications; 2) rupture; or 3) disease. *Id.* Regardless of which option is chosen, the claimant would have to present certain specified proof of injury before receiving compensation.

## B. TCC's Proposal

The TCC's recommended approach to estimation is built upon the following asserted principles. All tort claimants possess an absolute right to have their claims liquidated by a jury trial. 28 U.S.C. § 1411(a); TCC's Estimation Motion at 7. Thus, "it is the tort system that [should] provide[ ] the ultimate basis" for determining the value of tort claims pending against the Debtor. *Id.* at 7. However, the power to conduct jury trials resides not with the bankruptcy court but with either the District Court of this district or the district court(s) where the tort claims are pending. 28 U.S.C. § 157(b)(5); TCC's Estimation Motion at 7–8. Nonetheless, "this Court can and must [estimate]" the aggregate value of the pending tort claims "for plan feasibility purposes." *Id.* at 8. Although a bankruptcy court has broad discretion to determine the most appropriate method of estimation, *id.* at 7 (citing *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir.1982)), this Court should strive "to implement a process that will produce [values] . . . substantially" equivalent to "actual liquidated tort system values." *Id.* at 8. In so doing, the Court "will increase the reliability of the estimated aggregate values and ensure that a reorganization plan, which is dependent upon these values, will in fact be feasible. . . ." *Id.*

In its basic form, the TCC's proposal is designed to solve a simple estimation equation: the total number of pending tort claims multiplied by the average value of each claim equals the total aggregate value of all claims. *Id.* at 17. Its procedure would first have this Court identify the relevant categories of tort claims. *Id.* Second, the number of claims in each category would be determined. Third, the value of claims in each identified category would be estimated. *Id.* Fourth, the total aggregate claim value for each category would be calculated. Finally, the total values for each category of claims would be added together to provide the total aggregate value of all pending tort claims. *Id.* Specifics of the TCC's proposal are summarized as follows:

1. **Identify Relevant Categories of Pending Tort Claims**—Tort claims would be separated into the following categories: *Id.* at 18.

a. Breast Implant Nondisease Claims—Claims alleging injury from nondisease complications such as: hardening of breasts due to capsular contracture; rupture of the implant; bleed-

---

**10.** The plan contemplates initial funding of $600 million to the Settlement Trust for compensation of products liability claims pending against the Debtor. Debtor's [Proposed] Disclosure Statement With Respect to Plan of Reorganization of Dow Corning Corporation at 86. If silicone gel is found to be pathogenic, the proposed plan contemplates funding of an additional $1.4 bil-

lion to the Litigation Trust. The Litigation Trust would primarily be used for the compensation of breast implant and nonbreast implant disease claims. *Id.* at 78. However, the plan reserves the right to liquidate breast implant and nonbreast implant nondisease claims through the Litigation Trust. *Id.* at 78–79.

ing or leaking of silicone gel through the encasing envelope; injury resulting from subsequent migration of silicone gel throughout the body; inflammation and infection; interference with the ability to take accurate mammograms; and physical and emotional injuries caused by the complications stated above. *Id.* at 2.

b. Breast Implant Disease Claims— Claims alleging that silicone gel "causes a disease process in women implanted with silicone gel breast implants." *Id.* at 4.

c. Breast Implant Explantation/Financial Loss Claims—Claims for the recovery of financial costs associated with explantation and reconstruction and nonfinancial damages arising from the disfigurement, pain and trauma associated with such procedures. *Id.* at 5.

d. Nonbreast Implant Claims—Claims alleging injury from the use of nonbreast implant medical devices either manufactured by the Debtor or containing silicone supplied by the Debtor. Examples of such devices include: temporomandibular joint ("TMJ") devices; Norplant implantable contraceptive devices; small joint orthopedic devices ("SJO"); nasal implants; chin implants; testicular implants; and penile implants. *Id.* at 15. Nonbreast implant claims allege both disease and nondisease related injuries.

2. **Estimating the Total Number of Breast Implant Claims**—Estimation of the total number of breast implant claims can be performed in any of these ways.

a. Method 1: Identify Number of Claims Using Existing Databases—Two databases currently exist that contain names of potential breast implant claim-ants—the MDL database, which consists of information provided by persons who registered to be part of the now defunct MDL Settlement; and a database maintained by the Debtor, which contains information on about 82,000 persons who filed lawsuits or claims against it involving breast implants. *Id.* at 20–23. Information contained in both databases would be used to assist the Court in identifying, categorizing, and valuing claims for purposes of estimation.

b. Method 2: Extrapolate Additional Claims From The Existing Data—The Court would use existing data to estimate the future incidence of disease and nondisease injuries likely to occur among present claimants. *Id.* at 24.

c. Method 3: Infer Number of Claimants From Population of Women With Silicone–Gel Breast Implants—After estimating the total number of women with breast implants, the Court would apply this number to estimates concerning the frequency of disease and nondisease injuries arising from breast implants. In so doing, the Court could project the total number of women likely to assert breast implant claims now and in the future. *Id.* at 25.

d. Method 4: Identify Claims Filed in Response to a Bar Date [11]

3. **Estimating Value of Breast Implant Claims**—The method used to estimate the value of breast implant claims would vary depending on the type of breast implant claim at issue.

a. Breast Implant Nondisease Claims—The value of nondisease breast implant claims may, by themselves, exceed the Debtor's total enterprise value.

---

[11]. The TCC opposed this method for identifying claims. *Id.* at 27–28. However, as stated *supra* p. 554, the Court has since ordered a bar date. Therefore, this will be the primary manner in which claims are identified.

Furthermore, on July 24, 1996, the Court denied the TCC's request to allow Multidistrict Litigation ("MDL") settlement registrations to qualify as either formal or informal proofs of claim in this bankruptcy proceeding. On appeal, the Honorable Denise Page Hood agreed that the settlement registrations do not qualify as formal proofs of claim. *In re Dow Corning Corp.*, No. 96–CV–73638–DT (E.D.Mich. January 17, 1997). However, Judge Hood concluded that the settlement registrations do qualify as informal proofs of claim. *Id.* at 11. The Debtor has appealed Judge Hood's decision. Depending on the Sixth Circuit's ruling, the Court may have to treat MDL settlement registrants who failed to file official proofs of claims in this case as possessing informal claims which can subsequently be amended to comply with formalities. *See, e.g., In re Dietz,* 136 B.R. 459 (Bankr.E.D.Mich.1992).

If this turns out to be the case, there would be no need for the Court to undergo the time consuming process of estimating the other two categories of breast implant claims. Therefore, the Court should give first priority to this category of claims.

i. *Summary Estimation Jury Trials*—This method is designed to "mirror[ ] the process employed in the tort system, and ... [should, therefore,] provide the most reliable data on the ultimate values of the unliquidated tort claims." Exhibit A–1 to TCC's Estimation Motion at 3. Six different summary jury trials designed to produce 384 jury verdicts within a 60–day period, *id.* at 4–5, would be implemented as follows:

A. *Selection of Cases*—Four plaintiffs would be selected for each summary trial. Potential plaintiffs would be selected from cases filed and pending against the Debtor at the time the bankruptcy petition was filed. *Id.* at 7. To select the plaintiffs, the TCC and the Debtor would both submit a list of five claimants. *Id.* at 6. Each side would strike three claimants from the other's list. The remaining four claimants—two from each list—would comprise the plaintiffs for one summary jury trial. *Id.* at 6. This process would be repeated five more times until sufficient plaintiffs for six summary jury trials have been selected. The summary jury trial process would consist of a total of 24 plaintiffs.

B. *Expedition of Pretrial Discovery*—Within ten days of the selection of the plaintiffs, each party would be required to file a "Summary Estimation Jury Trial Disclosure Form," which would contain certain predetermined information about each of the selected plaintiffs. *Id.* at 7. Pretrial discovery would begin immediately upon receipt of the disclosure form and would last no longer than 30 days. *Id.* at 8. Certain limitations would be placed on the scope of discovery. For instance, plaintiff depositions could not exceed two hours, fact witness de-positions could not exceed three hours, and expert witness depositions could not exceed four hours. *Id.* at 9. Disputes concerning witness availability or the location of depositions would be resolved by this Court. Evidentiary disputes would be resolved by the District Court. *Id.* at 9–10.

C. *Pretrial Conference and Rulings*—Upon the close of discovery, parties would have five days to exchange lists of witnesses and exhibits. *Id.* at 10. After this exchange, parties would have an additional five days to file all evidentiary related motions and objections with the District Court. Seven days after the filing of motions and objections, the District Court (or a magistrate judge designated by the District Court) would conduct a pretrial conference at which time the District Court would rule on all evidentiary matters. Three days after the pretrial conference, parties would exchange final exhibit and witness lists. *Id.* at 10–11.

D. *Summary Estimation Jury Trials*—As soon as practicable after completion of all pretrial matters, the summary jury trials would be conducted before the district judge (or a magistrate judge designated by the District Court). *Id.* at 11. Each summary jury trial would consist of "opening statements, direct and cross examination, the presentation of ... visual exhibits, and final arguments." *Id.* at 4. Each side would have a total of four hours, including time spent on both direct and cross-examination, to present its case. *Id.* at 11. Each summary jury trial would be video-taped for future presentation to a jury. *Id.*

E. *Venue Selection*—Four different venues would be selected for presentation of the videotaped summary jury trials. The TCC and the Debtor would be jointly responsible for venue selection as well as the scheduling of the time and location of each summary jury trial. *Id.* at 13–14. Cities and

states where large numbers of breast implant cases are pending against the Debtor would be appropriate venue choices. *Id.* at 13.

F. *Presiding Judicial Officers*—Retired federal and state court judges would be selected to preside over jury selection in the chosen venues. *Id.* at 12. The presiding judicial officers would also be responsible for performing any duties necessary to preserve proper judicial decorum and procedure during presentation of the videotaped summary jury trials to the various juries. *Id.*

G. *Selection of Jury Pools and Juries*—For each venue, the TCC and the Debtor would jointly select a random jury pool. Actual jury selection would be implemented through an expedited *voir dire* process. *Id.* at 14–15. Juries would consist of eight persons and two juries would be impaneled for each presentation of a videotaped summary jury trial. *Id.* at 14.

H. *Presentation of Videotaped Summary Jury Trials*—The six videotaped summary jury trials would each be presented twice in the four chosen venues.

I. *Rendering of Verdicts*—Each jury would deliberate on the evidence and render a verdict. A liability verdict could only be returned by agreement of at least seven of the eight jurors. *Id.* at 15. A damage verdict could only be returned by agreement of at least six of the eight jurors. *Id.* The protocol would result in 16 verdicts for each of the 24 plaintiffs for a total of 384 verdicts on nondisease breast implant claims.

J. *Summary Jury Verdicts and Purposes of Estimation*—Data obtained through the summary jury trials would be used by the Court to assist in estimating the total value of all nondisease breast implant claims.

ii. *Identify Component Costs and Values of Damages*—Actual costs to perform certain mammary surgical procedures (i.e. the costs of explantation and reconstruction) would be compiled. This information would be used to supplement data obtained through summary jury trials. TCC's Estimation Motion at 37.

b. Breast Implant Disease Claims

i. *Closed Claims Analysis*—This method of estimation involves two steps. First, prebankruptcy cases resolved by the Debtor, through settlement and actual verdict, would be analyzed to determine the value placed on each claim and how the amount related to the characteristics of the claims (i.e. how payment amounts differed for each type of injury, severity of injury, place of resolution, date of resolution, etc.). *Id.* at 29–30. Next, values determined in step one would be applied to claims pending before this Court. *Id.* at 30.

ii. *Analysis of MDL Settlement Data*—Values obtained through Closed Claims Analysis would be supplemented with analysis of the MDL Settlement values.

iii. *Summary Estimation Jury Trials*—Not recommended as a method for estimating the value of breast implant disease claims because enough data already exists to value these claims fairly and efficiently. *Id.* at 28–29.

c. Breast Implant Explantation/Financial Loss Claims—The value of these claims would generally be estimated by utilizing data obtained through the breast implant nondisease claims estimation procedures detailed above. *Id.* at 38.

**4. Estimating the Value of Nonbreast Implant Claims** [12]

---

**12.** The TCC explained that claims arising from the use of Norplant Implantable Contraceptives should not be estimated at this time. TCC's Estimation Motion at 43. Any liability that might be incurred by the Debtor in connection with Norplant would stem from the fact that the devices are coated with silicone. *Id.* at 41. However, no liability has yet been attributed to the Debtor for Norplant claims. *Id.* at 40. Moreover, if the Debtor incurs liability in con-

a. Closed Claims Analysis—The Court would analyze claims against the Debtor that were resolved, through settlement or actual verdict, prebankruptcy. However, the amount of data available for resolved nonbreast implant claims, is limited. *Id.* at 41. Therefore, the Court may need to supplement this estimation method with the methods described below. *Id.* at 38.

b. Identify Component Costs and Values of Damages—The costs of performing certain corrective surgical procedures would be compiled and used to supplement data obtained through closed claims analysis. *Id.*

c. Summary Estimation Jury Trials— This method of estimation would only be used if the above methods prove insufficient. *Id.* If summary jury trials do become necessary to fairly estimate the value of this category of claims, a protocol similar to that used with breast implant nondisease claims would be utilized.

5. **Post-Estimation Procedures—** Though not directly addressed by its Estimation Motion, the TCC would anticipate, as part of a confirmed plan of reorganization, the establishment of a claims resolution facility for the purpose of liquidating allowed claims post-confirmation. *Id.* at 49.

### III. The Claims Allowance Process

In relevant part, the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). Given this broad definition, there is no question that a personal injury claim not yet reduced to judgment falls within its scope. 2 *Collier on Bankruptcy,* ¶ 101.05[6] (15th ed. rev.1997);

*See also* 28 U.S.C. § 157(b)(2)(B) (implicitly assuming that "unliquidated personal injury tort or wrongful death claims" constitute "claims"). Upon filing a bankruptcy petition, a debtor must list all known claimants, including both commercial and tort claims. 11 U.S.C. § 521(1). As a general rule, a creditor must file a proof of claim to be able to share in the bankruptcy estate. 11 U.S.C. § 501. However, in chapter 11 cases, claims originally scheduled by the debtor per § 521(1) will be deemed filed unless the debtor lists those claims as "disputed, contingent, or unliquidated." 11 U.S.C. § 1111(a). If the validity of a claim is contested by the debtor in this manner, then the potential claimant must physically file a proof of claim in order to satisfy the requirements of § 501. In this case, the Debtor scheduled virtually all personal injury claims against it as either "disputed, contingent, or unliquidated." As a result, personal injury claimants wishing to share in the Debtor's bankruptcy estate were required to file a proof of claim by the deadlines fixed by the Court. Section 502(a) provides that all claims filed pursuant to § 501 are deemed allowed unless a party in interest objects to it. 11 U.S.C. § 502(a). To nobody's surprise, the Debtor did just that with respect to the allowance of virtually all of the tort claims filed in this case.

When a party objects to the allowance of a claim in bankruptcy, the bankruptcy court generally determines whether the claim is valid under applicable nonbankruptcy law and, if so, in what amount. 11 U.S.C. § 502(b); *In re Dow Corning Corp.,* No. 95-20512, 1995 WL 495978 (Bankr.E.D.Mich. Aug. 9, 1995). In addition, when "the fixing or liquidation of [an unliquidated claim] . . . would unduly delay the administration of the case," the bankruptcy court has the authority to estimate a claim for purposes of allowance.[13] 11 U.S.C. § 502(c). However, there

nection with Norplant, an indemnity agreement between the Debtor and Wyeth–Ayerst (the sole manufacturer and distributor of Norplant) transfers any such liability back to the manufacturer. *Id.* at 42.

**13.** In reality, estimating a claim for purposes of allowance typically has the same effect as actual-

ly liquidating the claim. After a plan is confirmed the debtor's obligation will generally be limited to the estimated amount. Thus, estimation is merely a quick way for a bankruptcy court to liquidate a disputed claim when a full-fledged trial would delay the administration of the case.

are limitations to this rule and a bankruptcy court's authority to either liquidate or estimate the value of a claim for purposes of allowance and distribution may be circumscribed depending on the type of claim with which the court is confronted.

Typically, a bankruptcy judge will "hear and determine" an objection to the allowance of a claim because the allowance of a claim is a "core proceeding." 28 U.S.C. § 157(b)(1), (2)(B). However, the liquidation or estimation of a *personal injury or wrongful death claim* for purposes of allowance and distribution is not a core proceeding. 28 U.S.C. §§ 157(b)(2)(B), (O). Pursuant to 28 U.S.C. § 157(c), a bankruptcy judge may preside over (that is, "hear") a non-core proceeding that is otherwise related to the case in one of two ways.[14] The first possibility is that the bankruptcy judge's findings of fact and conclusions of law will be submitted to the district judge who will then enter any final order or judgment (that is "determine" the matter) after making a *de novo* review. 28 U.S.C. § 157(c)(1). Under the second possibility, the bankruptcy judge can not only hear, but also determine the dispute by entering a final order, subject only to a formal appeal. 28 U.S.C. § 157(c)(2). Importantly, this second possibility can occur only if all of the parties to the proceeding consent. *Id.*

There are even more complications when the claim is one for personal injuries or wrongful death. Under 28 U.S.C. § 157(b)(5), the district court where the bankruptcy case is pending "shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." *See also* 28 U.S.C. § 1334(c)(1) (permitting the district court to "abstain[ ] from hearing a particular proceeding" so that a state court can hear it). At first glance,

these statutory provisions appear to take away all bankruptcy court authority to even hear a personal injury claim for purposes of allowance or distribution. But as stated, one choice of venue is to have the personal injury claim tried in the district court where the bankruptcy case is pending. The statute does not necessarily say that the district judge where the bankruptcy case is pending will hear the claim, only that the claim will be heard in the district court. The bankruptcy court is of course a unit of the district court. 28 U.S.C. § 151. This suggests that Congress left the door open for a bankruptcy judge to hear a personal injury case. Such a conclusion is potentially qualified by 28 U.S.C. § 1411(a), which provides that bankruptcy does not affect an individual's right to a jury trial regarding personal injury claims. However, 28 U.S.C. § 157(e) provides that if a right to a jury trial applies to a proceeding in bankruptcy, the bankruptcy judge may conduct a jury trial if the district court gives approval and all the parties expressly consent.

The above analysis indicates that so long as the procedural requirements of 28 U.S.C. § 157(c) and (e) are satisfied, a bankruptcy judge possesses the authority to hear and to determine a personal injury claim for purposes of allowance and distribution. In theory, all parties can waive their rights to a jury trial, and consent to determination by the bankruptcy judge sitting without a jury. Alternatively, they can retain the jury trial right but consent to the bankruptcy judge conducting it.[15] Nonetheless, in this case, the likelihood of satisfying all the procedural prerequisites is, to say the least, remote. Moreover, a district judge is much better qualified to preside over a complex product liability jury trial than a bankruptcy judge lacking any comparable experience.

See 4 *Collier on Bankruptcy,* ¶ 502.04[3] (15th ed. rev.1997).

**14.** The personal injury claims against the Debtor are obviously related to the case, and the Sixth Circuit has also held that personal injury claims of silicone-gel breast implant recipients pending against nondebtor defendants are related to this case. *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re*

*Dow Corning Corp.*), 86 F.3d 482 (6th Cir.1996), cert. denied, —— U.S.——, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997).

**15.** In this district, the District Court has already ordered that bankruptcy judges are authorized to conduct jury trials (at least until February 7, 1998, which is two years after the date the order was entered.) *See* Administrative Order No. 96–AC–023, dated February 7, 1996.

It is apparent, then, that the Court's role in liquidating the claims of greatest relevance to the Debtor's reorganization is quite limited. Perhaps in recognition of this limitation, the movants have asked the Court to play the role of a referee in a shadow-boxing contest—the estimation of the aggregate value of tort claims pending against the Debtor. The wisdom of engaging in such an endeavor is discussed below.

## IV. Inappropriateness of Estimating the Tort Claims

### A. Preface

In this portion of the Opinion we provide a disclosure and a caveat. First the disclosure. The Court made an unsigned draft of this Opinion available to counsel for the Debtor, its shareholders, the official committees, the Blue Cross/Blue Shield plans and the breast implant co-defendant manufacturers. Receipt of the draft was made subject to assurances of confidentiality. The Court received written responses from the recipients and conducted a chambers conference with them to discuss their views and the general status of the case. Those responses were considered and this Opinion reflects certain changes made to the draft as a result.

Now the caveat. Although the Debtor has filed a plan, it was never meant to be the vehicle to carry the Debtor out of bankruptcy. *See In re Dow Corning Corp.*, 208 B.R. 661, 665 (Bankr.E.D.Mich.1997). The thoughts which follow are based on a single assumption: that no plan of reorganization is proposed which has the support of all of the necessary constituencies. If, as we fervently desire, the parties are able to bridge the substantial divide in their positions and come together on a consensual plan which garners the acceptances of the voting classes, our comments should be read solely as footnotes

to history. We therefore do not irrevocably foreclose the possibility of estimating unliquidated tort claims, say as part of a confirmed consensual plan of reorganization. But if this case deteriorates into litigation Armageddon, let this be a start to the design of the battlefield. Based on this enormous caveat, and in the context of a case in which no plan has obtained even the mild approval of any relevant constituency, we now begin to explain why both motions for estimation protocols will be denied.

■ Both the Debtor and the TCC seem to have assumed that cause exists to estimate the tort claims pursuant to § 502(c) as neither one presented any evidence with respect to this point.[16] Indeed, the cross-motions start from a common premise that estimation is necessary and diverge only on the method of doing so. However, the establishment of cause is a predicate to any discussion over which of the proposed methods of estimation would most accurately approximate the value of pending tort claims. Consequently, the Court begins by addressing the cause issue, and for the following reasons, determines that cause does not exist to estimate the tort claims.

### B. Delay Associated With Liquidating Tort Claims Not "Undue"

#### 1. *When Estimation Is Required by the Bankruptcy Code*

■ The Bankruptcy Code only requires the Court to estimate the pending tort claims if their "liquidation ... would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). *See O'Neill v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, ... fixing the claim must entail undue

---

**16.** Many commentators now assume that mass tort bankruptcy cases must follow a certain script: first estimate aggregate tort claims; then negotiate a fund to satisfy it; and finally, devise a procedure for fairly apportioning the funds, including various alternative dispute resolution and procedural hurdles for claimants seeking to invoke their ultimate right to a jury trial. *See, e.g.,* Kenneth R. Feinberg, *The Dalkon Shield Claimants Trust,* 53 Law & Contemp. Probs. 79, 84 (Autumn, 1990). Perhaps it is this general

and apparently unquestioned view that resulted in the parties' failure to present evidence on this issue. But there are good reasons to question the premise upon which the standard mass tort model for reorganization rests. The model rests on the shaky foundation that judges can accurately estimate the results of a series of extremely speculative problems. While one court "seems" to have pulled it off (*A.H.Robins* ), at least another has predictably failed (*Johns–Manville* ).

delay in the administration of justice."); *Apex Oil Co. v. Stinnes Interoil, Inc. (In re Apex Oil Co.)*, 107 B.R. 189, 193 (Bankr. E.D.Mo.1989) ("[T]he duty to estimate is not mandatory *until* the court determines that liquidation of the claim outside of the bankruptcy court would unduly delay the bankruptcy proceeding."). From the plain language of § 502(c), it is clear that estimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation. Nonetheless, bankruptcy law's general rule is to liquidate, not to estimate. For estimation to be mandatory, then, the delay associated with liquidation must be "undue."

■ Something is "undue" if it is "unjustifiable." Random House College Dictionary, at 1433 (rev. ed.1980). Inquiry into whether liquidating the tort claims would be unjust, due to any case delay that may result therefrom, dictates that the Court perform a kind of cost-benefit analysis by considering the time, costs and benefits associated with both estimation and liquidation.

2. *Effects of Estimation on Administration of the Case*

■ There are good reasons to liquidate, and not simply estimate, unliquidated claims. First, the very real concern that the estimates may prove to be inaccurate would be eliminated. *See, e.g., In re Joint Eastern and Southern Dist. Asbestos Litig.*, 78 F.3d 764, 769 (2d Cir.1996). Second, none of the time delay or expense associated with litigation over the question of how to best estimate the tort claims would be incurred.[17] Third, time delay and expense associated with the estimation process itself would be avoided.

In contrast, the primary disadvantage associated with pursuing the liquidation process from a case administration standpoint—

time delay—is highly speculative and, in any event, need not be terribly onerous. It is speculative because, as the second and third benefits listed above suggest, there is no guarantee that estimation would in fact move matters along significantly faster. To begin with, regardless of the estimation method selected, for the process to have any semblance of fairness it will necessarily involve hearings that would be quite lengthy and protracted. After all, the extremely contentious issues surrounding the tort claims are highly complex and their resolution will require the presentation of many witnesses, many pieces of evidence and extensive oral argument. Abbreviating the time parties have to present their cases at an estimation hearing would, in the Court's opinion, be ill-advised. Considering the magnitude of the claims involved and the absolute importance of rendering a fair and accurate decision, the Court cannot countenance a valuation procedure that would place artificial time constraints on the parties' ability to properly present their cases. And after completion of the estimation hearings, the Court would undoubtedly require considerable time to sift through and reflect upon the massive amount of evidence presented before issuing its ruling.

The above-noted time delays that result from estimation are directly applicable to the Debtor's Estimation Motion since its proposal would involve a determination of the disease-causing potential of silicone gel through a full-blown causation hearing. On the other hand, the TCC would likely argue that its estimation proposal does not involve extensive time delay. First, with respect to breast implant disease claims, the TCC proposes to estimate the value of such claims through statistical extrapolation of existing data. Consequently, time delay associated with discovery and hearings would be avoided. However, for reasons which will be discussed in more detail under Part IV.D., *infra* pp. 570–572, this aspect of the TCC's proposal is

---

**17.** The competing estimation motions provide a vivid example of how divisive, time consuming and expensive this issue can become. However, in this case the litigation, resultant expense and delay have already occurred. Therefore, this factor is of diminished importance with respect to the current motions. Nonetheless, other bankruptcy courts will more than likely be forced to grapple with similar issues in the future and those courts may find this factor to be of significant relevance.

without merit and the time savings associated with it are not worth considering.

With respect to the estimation of nondisease breast implant claims, the TCC proposes that such claims be resolved through summary jury trials designed to generate 384 jury verdicts in an accelerated period of time. While no attempt has been made to quantify the actual anticipated cost of implementing this proposal, there can be little doubt that such a procedure would be very expensive as well as complex in that it would involve considerable coordination between this Court and various courts around the country. Additionally, the time involved, while certainly not approaching that which would be involved in trying 384 cases to actual jury verdict, would nonetheless be considerable. Furthermore, even if the use of summary jury trials for estimating the value of nondisease claims were justified, the rendering of the mock jury verdicts would not end the estimation inquiry. The results would have to be extrapolated to the rest of the claims in order to come up with a total nondisease value figure. Since estimation is ultimately a determination to be made by the bankruptcy court, this extrapolated information would then be presented to the Court to assist us in estimating the value of all tort claims pending against the Debtor.

Moreover, dissatisfaction with an estimation of the total value of tort claims could, as in *Bittner*, 691 F.2d at 135, result in an appeal, occasioning further time delay. One could argue that an estimate of the value of all of the tort claims is not immediately appealable since it does not fully decide the rights of any party. Nevertheless, just arguing that threshold question would take time even if the appellate court(s) ultimately agree(s) that the appeal was interlocutory and refused to entertain it. And even if a reorganization plan is approved over the objections of an aggrieved party in interest, disagreement with the Court's estimation could be a basis for appealing such approval. *Cf. Colorado Mountain Express, Inc. v. Aspen Limousine Serv., Inc. (In re Aspen Limousine Serv., Inc.)*, 193 B.R. 325, 339 (D.Colo. 1996) (wherein appellants argued that "[h]ad the bankruptcy court ... properly" estimated its claims, "it would have found the plan unconfirmable under §§ 1129(a)(9)(A) and (a)(11)"). In that event, the court(s) of appeals would have to revisit the estimation issue and the resultant delay would essentially be the same as if estimation were not interlocutory.

3. *Effects of Estimation on the Parties in Interest*

Even if estimation would result in a substantially faster plan confirmation process, it certainly seems reasonable to question the real significance of that perceived benefit. The Debtor asserted that a quick resolution of this bankruptcy case is necessary because both customers and employees are growing anxious over the eventual outcome of the case and that such nervousness could have a detrimental effect on its business. But the fact is, the Debtor continues to operate on a profitable basis in more-or-less the same fashion as it did pre-petition, except that it no longer has the pressure of thousands of lawsuits proceeding against it simultaneously. In addition, no party in interest has expressed a desire to see the Debtor dissolved or liquidated at the end of this case. The only question is who will be the owners of the reorganized Dow Corning. Consequently, there is little reason for customers to be anxious.

Employees, on the other hand, may indeed have reason to be nervous. Considering the highly charged nature of this case, if the tort claimants are successful in acquiring ownership of the reorganized Dow Corning it is not inconceivable that there would be a subsequent management shakeup. However, this factor is an underlying current in many chapter 11 bankruptcies, particularly when a large company is involved. The Debtor's management has successfully operated under this cloud of uncertainty since the beginning of the case and there is no reason to believe that management cannot effectively continue to do so now.

Another potential consideration is the fact that the Debtor's incurrence of bankruptcy-related legal costs is ongoing. However, it does not seem that the Debtor would experience a dramatic increase in those costs should the bankruptcy case be prolonged

pending claim liquidation. The case would essentially be in a kind of "holding pattern" during this extended period of time. Furthermore, any such incremental cost would be offset to the extent the estate avoids estimation-specific costs that would otherwise have been incurred.

The Debtor argued that it is incurring interest expense to its commercial creditors while this case remains in chapter 11. But that is not necessarily true. If, as the TCC maintains, the Debtor is hopelessly insolvent due to the billions of dollars of liability owed to the tort claimants, the commercial creditors might not be entitled to interest, 11 U.S.C. § 502(b)(2)—or for that matter, full payment of principal. Even if interest is accruing, since the Debtor currently has use of the money, it certainly has the ability to invest the funds to at least partially offset such expense. Moreover, it is safe to assume that the Debtor, being a large, sophisticated company, is already engaged in such prudent investment activity. In any event, no attempt to quantify this contingent expense was made. For all of the above reasons, it is therefore not readily apparent why "time is of the essence" for the Debtor with regard to plan confirmation.

On the other hand, it may well be true that time is not on the side of some or, perhaps, many of the tort claimants. Obviously, those who are in poor health or financially strapped would understandably view even a six-month distribution delay as "undue." However, there is no reason to believe that estimation would result in a faster distribution of proceeds to tort claimants in the event that the Debtor is found liable. In fact, analysis suggests that estimation would only lengthen the time to distribution since funds would not be disbursed until claims are liqui-

dated post-confirmation. Estimation would merely put off the unavoidable eventuality of liquidation.

Commercial claimants could argue that they should not be made to wait indefinitely for payment while the tort litigation carries on into the next millennium. While this argument was not raised by the TCC or the Debtor in connection with their estimation motions, it is worth considering because fully and finally adjudicating all tort claims against the Debtor could take several years and the Court recognizes that some commercial creditors may suffer financial hardship during the intervening period. One must remember, though, that one of the primary goals of bankruptcy is to treat all similarly-situated creditors fairly and equally. In other words, the tort and commercial claimants "enjoy equal standing against the debtor's assets." *In re ARN Ltd. Partnership,* 140 B.R. 5, 14 (Bankr.D.D.C.1992). Consequently, they are entitled to share in the estate on a *pro rata* basis, without regard to whether their respective claim is based in tort or contract. *See Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of the debtor's property."). A *pro rata* division of assets can only be performed once the value of all pending claims has been determined. Therefore, a pre-liquidation distribution to commercial creditors would first require estimation of all claims pending against the Debtor.[18]

Moreover, concern for prompt payment to commercial creditors has been substantially lessened for another reason. Many commercial claims have been purchased by compa-

---

**18.** The commercial creditors who feel faint at the thoughts expressed in the text should remember the caveat, *supra* p. 562, that this Opinion assumes a world with no confirmed plan. Of course, a plan may separately classify and consequently treat differently commercial and tort claims. *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.),* 800 F.2d 581, 585–87 (6th Cir.1986) (union placed in class separate from other impaired creditors for voting purposes); *Steelcase, Inc. v.*

*Johnston (In re Johnston),* 21 F.3d 323, 327 (9th Cir.1994) (partially secured creditor's claim was sufficiently dissimilar from those of other creditors to justify separate classification); *In re Rochem, Ltd.,* 58 B.R. 641 (Bankr.D.N.J.1985) (tort creditor's claim treated differently from claims of trade creditors); *In re EBP, Inc.,* 172 B.R. 241 (Bankr.N.D.Ohio 1994) (tort claimant classified separately from other unsecured creditors). But without such separate classification, all unsecured claims not entitled to statutory priority must be treated similarly.

nies that are in the business of buying trade claims at discounted values with the expectation that they will be able to make a profit on the transaction when payment is eventually received from the bankruptcy estate. A viable market for buying and selling commercial claims against the Debtor exists. Thus, remaining original commercial creditors as well as trade claim specialists who have recently arrived upon the scene both have the ability, as some have already demonstrated, to remove themselves as parties in interest from this bankruptcy case whenever they so choose.

#### 4. Need for Liquidation Not Eliminated by Estimation

In addition, one must add to the list of time considerations associated with estimation the fact that once estimation is completed and a plan of reorganization confirmed, individual tort claims would still have to be liquidated. The Debtor's plan envisions a common-issue causation trial taking place before the District Court post-confirmation. Such a trial would take as long or longer than the estimation hearings, would essentially duplicate them and would be subject to immediate appeal. The TCC's Estimation Motion does not describe how tort claims should be liquidated post-confirmation. Nonetheless, post-confirmation liquidation of tort claims cannot be avoided. Whether liquidation occurs through a common-issue trial, through individual trials, through a series of representative trials with the results being extrapolated to the tort claims as a whole or through some other acceptable means, liquidation must occur. And regardless of the form that it takes, the liquidation process would be time consuming.

Viewed in this light, estimation under the protocols of either movant becomes more or less superfluous to the valuation process for the issue of liability would end up being litigated more than once: once during estimation, and once (if not multiple times) post-confirmation. Concededly, estimation may allow the Debtor to exit from bankruptcy a

little sooner. But it would almost certainly serve to lengthen the time of recovery for valid tort claims (and valid commercial claims, for that matter). When determining whether delay to the administration of a case is unjust, a bankruptcy court must consider the rights of all parties in interest, not just those of the debtor. And in this Court's view, opting for estimation so that the Debtor can quickly exit from bankruptcy with discharge in hand, while injured victims with valid claims struggle on for years before finally receiving compensation is unjust.

#### 5. Advantage of Proceeding Directly to Liquidation

From the above discussion, it is apparent that, in the current context,[19] estimation is not necessarily advantageous from a case administration standpoint and may in fact be detrimental. While estimation may be a somewhat abbreviated form of liquidation, they are still essentially duplicative processes. With nonpersonal injury claims, estimation is often justified because it can entirely eliminate the need for liquidation. However, the present motions deal with estimating the value of personal injury claims and, absent settlement, liquidation simply cannot be avoided. As a result, proceeding directly to liquidation will have the salutary effect of saving time, money and eliminating potential negative side effects that could easily result from the estimation process. The method of liquidation which we believe is most appropriate for the present situation is discussed in detail under Part V., *infra* pp. 574–598. While the above discussion provides sufficient justification for denying the pending motions, there are additional reasons which strongly counsel against proceeding down the estimation path.

#### C. Estimation Not Necessary to Debtor's Proposed Plan of Reorganization

█ The strategy behind the Debtor's request for estimation of the aggregate value of tort claims is to limit the amount it will

---

**19.** We reiterate that the context here is one where there is no agreement about a way out of this case. We do not mean to suggest that the Court adamantly refuses to consider estimation

of unliquidated claims. There may very well be good reason to estimate claims in some other context, say as part of the terms of a confirmed consensual plan.

ultimately have to pay on account of tort liability. In other words, the Debtor's strategy assumes that estimation will lead to a discharge of all liability and that individual post-confirmation liquidation can only be had against a trust fund established as part of a plan of reorganization regardless of whether such liquidation proves that the estimate was too low. But this is not a foregone conclusion. And if the assumption is incorrect, the estimation process would have been a colossal waste of time and money.

The Debtor argues that estimation is necessary because parties in interest must know whether the amount the Debtor intends to set aside for payment of these claims will be sufficient to pay them in full, as it purportedly intends to do. Since the hearings on the estimation motions, the Debtor has filed its proposed plan of reorganization, which contains a provision earmarking a fund of up to $600 million to settle personal injury claims and another fund of $1.4 billion to litigate personal injury claims.[20]

This additional reasoning justifying the need for estimation is unpersuasive. For one thing, no matter what answer this Court were to give as its estimate of the value of all tort claims, there is almost no likelihood that the estimate would prove accurate.[21] Therefore, parties in interest will derive no comfort from the results of a lengthy and complex estimation war. And second, under the Debtor's plan pre-confirmation claims estimation is simply unnecessary. The plan's treatment of tort claims is summarized in the Debtor's disclosure statement as follows:

> At Closing, the Reorganized Debtor will, in full satisfaction and discharge of its liability for all [tort claims], cause the following to occur: (a) the execution and delivery by the Reorganized Debtor of the Settlement Trust Agreement and the Litigation Trust Agreement, thereby establishing the Settlement Trust and the Litigation Trust and (b) the execution and delivery by the Reor-

ganized Debtor of the Settlement Trust Funding Payment Agreement and the Litigation Trust Funding Payment Agreement, together with any payment, transfer or assignment then due thereunder. Debtor's [Proposed] Disclosure Statement With Respect to Plan of Reorganization of Dow Corning Corporation at 70.

> The Settlement Trust Funding Payment Agreement shall provide that the Reorganized Debtor shall fund $600 million to the Settlement Trust in satisfaction of all Products Liability Claims resolved through the procedures established by the Settlement Trust Agreement. *Id.* at 86.

> The Litigation Trust Funding Payment Agreement shall provide that the Reorganized Debtor shall fund up to $1.4 billion to the Litigation Trust in satisfaction of all Products Liability Claims that are not resolved through the procedures established by the Settlement Trust Agreement. *Id.*

> The funding of the Trusts has been specified in an amount sufficient to provide for total funding (fixed and contingent) in an amount equivalent to the Global Settlement.... Reference is made to the Global Settlement for purposes of the derivation of the amount of funding for the Trusts not because DCC (the Debtor) believes that these Claims have this value but reflects the fact that the Global Settlement, accepted by tort plaintiffs under conditions much more favorable to their alleged disease Claims, should provide adequately for the maximum aggregate value of these Claims in the event that an adverse causation determination occurs. *Id.* at 88.

> Upon Allowance, Claims shall be paid in whole or in part based upon the amount then available under the Litigation Trust Funding Payment Agreement. In the event of the Trustees' evaluation that there will be insufficient funds to pay all Allowed

---

**20.** The TCC agrees with the Debtor that estimation of the aggregate value of all tort claims is necessary. However, it intends to show that the Debtor is incapable of paying all claims in full because of its belief that the aggregate value of such claims exceeds the value of the Company. If the TCC is correct, the equity interest of the shareholders should be ignored, if not outright canceled.

**21.** An exception to this logical observation might be *A.H. Robins*. However, the manner in which accuracy was ultimately achieved in that case is dubious and troubling. *See infra* note 60.

Claims in full immediately, the Trustees may pay an appropriate Pro Rata amount of the Allowed Claims (based upon the principle of treating all similar Claims in substantially the same manner), with further payments to be made when additional funds become available to the Trust. *Id.* at 102.

Except as otherwise expressly provided in the Plan or the Confirmation Order, confirmation of the Plan shall discharge the Debtor as of the Effective Date from and completely extinguish the Debtor's liability for any Claim and Debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation Date, or from any conduct of the Debtor prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Debts, whether such interest accrued before or after the date of commencement of the Case, and including, without limitation, all Claims and Debts based upon or arising out of Products Liability Claims, and from any liability of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not a Proof of Claim is filed or is deemed filed under section 501 of the Bankruptcy Code, such Claim is allowed under section 502 of the Bankruptcy Code, or the holder of such Claim has accepted the Plan. *Id.* at 102–03.

Except as otherwise expressly provided in the Plan, on the Effective Date all Persons who have held, hold, or may hold Claims, including, without limitation, Breast Implant Claims, Non-breast Implant Claims, and LTCI Claims, in consideration of the obligations of the Debtor and its Joint Ventures and Subsidiaries under the Plan, including the establishment and funding of the Trusts, shall be deemed to have forever waived and released all rights or Claims, whether based upon tort or contract, or otherwise which they heretofore, now or hereafter possess or may possess against the Debtor, the Joint Ventures, the Subsidiaries, the Shareholders and the current and former officers,.... *Id.* at 104.

To restate what the above excerpts make abundantly clear, the Debtor's plan does *not* say: "The Reorganized Dow Corning will pay all tort claims in full. The Debtor expects that the $600 million set aside in the Settlement Trust and the $1.4 billion reserved for the Litigation Trust will be sufficient to do that. However, if it proves to be inadequate, the Reorganized Debtor will nevertheless pay however much is required to satisfy all such claims in full." Such a provision would truly be a promise to pay all tort claims in full. And if the Debtor's plan did contain this hypothetical provision, it would be necessary to determine the aggregate value of tort claims because that value could potentially exceed the financial capabilities of the Reorganized Debtor. Nobody doubts the Debtor's ability to put up war chests totaling $2 billion. But it could be that the aggregate amount of tort claims far exceeds $2 billion and that the Reorganized Debtor is incapable of paying the additional amounts necessary to satisfy those claims in full. In that case, the Court could not confirm the proposed plan because the Debtor would be unable to satisfy 11 U.S.C. § 1129(a)(11), commonly referred to as the requirement to establish the "feasibility" of a plan.

Instead, the Debtor's plan essentially says: "The Reorganized Dow Corning will set aside $600 million for settlement of personal injury claims and an additional $1.4 billion for litigation of personal injury claims. The Debtor expects that these amounts will be sufficient to pay all such claims in full. However, if it proves to be inadequate, the claimants will nevertheless receive only that amount and have to share these amounts *pro rata.* To the extent these claimants are not paid in full, the remaining debt will be discharged."

From this summary it is clear why estimation is not necessary for plan confirmation purposes. The Reorganized Debtor's ability to pay tort claims in full would simply not be an issue under § 1129(a)(11) for no matter how large the actual aggregate tort liability may turn out to be, the Reorganized Debtor

would clearly be able to perform the pertinent terms of the plan. If the Court estimated the aggregate claims at something within the $2 billion treasury, the plan would be feasible. If the Court estimated the claims at an amount far in excess of $2 billion, the plan would still be feasible, because the Reorganized Debtor's obligation is capped by the plan at $2 billion, and the Debtor has $2 billion.

Furthermore, as noted, *supra* pp. 560–562, there are special rules for personal injury and wrongful death claims. These claims must be liquidated via a jury trial if the claimant requests one, and they cannot be estimated by a bankruptcy judge for purposes of distribution unless all parties consent. However, allowing a bankruptcy judge to estimate the aggregate value of all claims for the apparently benign reason of determining feasibility of a plan of reorganization, when combined with the effects of 11 U.S.C. § 1141(d), can create the result that the estimation was actually for purposes of distribution as well.

A personal injury claimant would, of course, contend that a plan cannot permit discharge of her claim without providing for actual—not hypothetical via estimation—payment in full. Such a claimant might, therefore, request the court to add appropriate conditions to the discharge which a debtor receives under § 1141(d) upon plan confirmation ("Except as otherwise provided in ... the order confirming the plan, the confirmation of a plan—(A) discharges the debtor from any debt....").[22] And if estimation for plan confirmation purposes results in *de facto* estimation for distribution purposes via the effects of the plan of reorganization and the discharge provisions of § 1141(d), a claimant's right to a jury trial for purposes of liquidating her claim becomes hollow. Therefore, a strong argument can be made that estimating the aggregate value of tort claims for plan purposes runs roughshod over personal injury claimants' rights.

But if a debtor cannot be assured of a discharge of all tort claims, it would not truly be reorganized; the debtor would continue to be a pariah in the credit markets, and that could seriously impair its chances for the business success which would be key to the plan. A debtor would surely argue that a personal injury claimant's right to a jury trial is perfectly protected by post-confirmation liquidation. A right to have a jury decide whether a claimant has a valid claim and if so, how much of one, means only that it would be a jury and not a judge who will decide those questions. A right to a jury trial does not mean a right to payment in full of the liquidated amount of the claim.

These are very powerful arguments. The Court is not yet called upon to decide them. However, even if the § 1141(d) discharge were effective against a fully or partially unsatisfied personal injury claim liquidated post-confirmation by a jury, the Debtor's proposal cannot be permitted to be the hidden lever to that result. For that would, in effect, mean that the bankruptcy court's estimation would result in an estimate of personal injury claims for distribution purposes. As we noted, *supra* p. 560, estimation of personal injury claims for distribution purposes is not a core proceeding. Since all of the personal injury claimants have not stipulated to this Court's determining the estimation, we would seem to lack the statutory authority to do anything but hear the estimation. And what a monumental waste it would be if all this Court did was hear, i.e., conduct, the estimation trial and issue proposed findings of fact and conclusions of law subject to *de novo* review by the district court.

On the other hand, an estimation of the aggregate value of all tort claims possessing all the consequences outlined above—possible discharge of personal injury claims which were insufficiently provided for due to a low estimation—could be something the district court could do. Although estimation for purposes of distribution is not a core proceeding, that only means that when done, it is a noncore proceeding which is otherwise well with-

---

**22.** After having estimated the claim of one of the creditors at zero dollars and therefore temporarily disallowing the claim against the debtor, one bankruptcy court did exactly that. *See Bittner v.*

*Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982) (The bankruptcy court, "in effect requir[ed] a waiver of discharge of the [creditor's] claims from Borne.").

in the bankruptcy jurisdiction of the district court.[23] However, the problem with allowing an estimation of a personal injury claim for distribution purposes even by a district judge is that it really does cut the heart out of a claimant's right to a jury trial. Once the estate pays the estimated claim and all the funds of the estate are disbursed, there would be no sense in seeking liquidation of the claim by a plenary trial of any type.[24]

These exceedingly complex questions all flow from the narrow special interest legislation of 1984 which created these unique protections for personal injury claims. Unfortunately, as so frequently occurs when Congress legislates piecemeal special interest provisions in the Bankruptcy Code, it fails to anticipate the havoc it wreaks on the flow and logic of the Code. Placing even a toe into these murky waters is unwise, for as we have shown, they hide the quicksand of deeper, more unanswerable questions. In summary, it is conceivable that, when plugged into a confirmed plan, an estimation of the aggregate value of all personal injury claims for purposes of feasibility, which on the surface appears benign and "core," would be transformed into a discharge of unsatisfied personal injury claims via § 1141(d). If that were the case, the estimation would turn out to be "non-core" for purposes of distribution and a bankruptcy court lacking the consent of all parties that would be affected thereby, would not have the authority to perform such an estimation.

## D. Specific Reasons for Rejecting TCC's Proposal

The TCC proposes an entirely different method of estimating tort claims than the Debtor, based upon an entirely different view of the major issues to be tried. The Debtor wants the issue of silicone gel toxicity to be heard in a single common-issue estimation in the Bankruptcy Court. The Court would then pin a number on the amount of aggregate damages that breast implant claimants should receive from a confirmed plan of reorganization. The TCC wants to focus on the implants' tendency to rupture or leak and to fix the amount of damages by holding a series of summary jury trials in courts around the country. Thereafter, experts would extrapolate from the results of those "verdicts" and arrive at a figure for the aggregate tort liability.

According to the Debtor, the breast implant debate turns on whether silicone gel is a toxic substance. It contends that the substance is bio-inert, which means that it has no systemic effect in the human body. The TCC most decidedly takes the contrary view, contending that silicone gel can cause—and in thousands of women has caused—serious diseases. The TCC says that the debate over the alleged toxicity of silicone gel can be indefinitely postponed pending the outcome of further scientific studies because even if the substance proves to be nontoxic, the damages due to the numerous women who will inevitably suffer from ruptured or leaking implants is so great as to wipe out equity's interest in the company, leaving the company to its creditors. It therefore argues that the Court should embark upon an estimation of the likely amount of aggregate damages due solely to rupture and leakage without even considering the potential diseases which women may contract from the implants.[25]

23. In *In re A.H. Robins Co.*, 88 B.R. 742, 743 (E.D.Va.1988), *aff'd*, 880 F.2d 694 (4th Cir.1989), the district judge conducted the estimation.

24. Remember that these statutes apply equally in chapter 7 cases and there it makes little sense to keep an estate open for years after all of the assets have been liquidated and the trustee is prepared to disburse.

25. Despite its rhetoric, the TCC produced no statistically meaningful evidence supporting its contention that non-disease personal injury claims alone render the Debtor insolvent. However, for purposes of this discussion, we will assume that even if silicone gel is exonerated as a pathogen, the non-disease claims may prove to be substantial. But this concession does not make the case for estimating non-disease claims first. No doubt, the TCC also maintains that disease claims alone also render the Debtor insolvent, so the argument cuts both ways. This situation suggests that the Court should focus on the relative merits of valuing disease or non-disease claims first. However, the Court hastens to add that this conclusion—that the Court focus on breast implant disease claims—does not dictate that procedures to liquidate non-disease claims and non-breast implant personal injury claims must necessarily await final liquidation of

The Debtor counters by pointing out that in the nearly three decades that it marketed breast implants, nondisease claims were not only few in number, but were easily and inexpensively resolved. Moreover, it argues, the amount of damages to which a woman might be entitled if her breast implant ruptures or leaks is directly related to whether the now free-floating silicone gel is likely to cause her to become ill. Thus, the question always comes back to one of toxicity.

The Debtor clearly has the better of this argument. Even the expert whom the TCC called to establish its premise about ruptured and leaking implants, plastic surgeon Lawrence E. Wolf, who for a short while was a member of the PCC,[26] supported the Debtor's hypothesis. Although he believed that over time, nearly every breast implant will rupture or leak, he also testified that he, like the FDA, would counsel patients not to have the implants removed if he was sure (like he used to be) that silicone was harmless. The guiding factor in whether to implant or explant, in his opinion, is the wishes of the patient. As a plastic surgeon, he recognizes that there usually is no immediate medical reason necessitating the performance of a particular procedure, especially with procedures pertaining to a breast implant. Whether or not others see the need, the patient of a plastic surgeon generally has a psychological need or desire to improve his or her appearance. After a successful procedure is performed, the patient should have greater self-esteem which itself can spawn improvements in the patients overall health. On the other hand, if the implants, which had previously provided the patient with good feelings about herself, now generate the negative emotions of fear and anxiety, it is in the patient's interest to remove them. Consequently, Dr. Wolf acknowledged, if it can be shown to a reasonable scientific certainty (a certainty he at one time claimed to have had in light of his having implanted thousands of women) that silicone is harmless, he would not only stop explanting women, but would even resume implanting them with silicone-gel implants. Transcript, July 18, 1996, at 129–132.

Although the Debtor will not be able to convince Dr. Wolf of the safety of silicone gel merely by the salutary results of a so-called common-issue trial, it is certainly likely that the fears and anxieties of thousands of implanted women will tend to subside after publicity about such a verdict. Indeed, Dr. Wolf has noticed that the number of patients seeking explantation is trending lower as more and more studies tend to show no connection between silicone gel and disease.

If the jury in such a trial were to determine that silicone gel is not toxic, and if fear and anxiety is thereby reduced, the leakage/rupture issue loses much of its force. Indeed, many women experiencing such symptoms might very well elect re-implantation, which according to the Debtor, is one of a number of remedies that was provided in nondisease cases before 1992. For this reason, the Debtor's suggestion that there be a common-issue trial on the issue of silicone gel toxicity is by far the better approach.

▪ Finally, the TCC's summary jury trial proposal is flawed. It is worth noting that the Fifth Circuit has recently held a very similar proposal to be improper. *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997). In that case, over 3,000 plaintiffs claim to have been injured as a result of acts and omissions of the defendant oil company. *Id.* at 1017. The district court ordered a "unitary trial" to determine the issue of generic causation for all plaintiffs as well as the issues of individual causation and damages for a selected group of claimants. *Id.* The group was to consist of 30 claimants, 15 to be selected by the plaintiffs and 15 to be selected by the defendant. *Id.* The court of appeals was favorable, under appropriate circumstances, to the use of a "bellwether" trial, the results of which would then be extrapolated to the group as a whole. *Id.* at 1019–20. Nonetheless, the court of appeals held that the trial contemplated by the district court was not a bellwether trial and that the results could, therefore, not be extrapolated to the remaining plaintiffs. *Id.* at 1019. The court stated that:

A bellwether trial designed to achieve its value ascertainment function for settle-

---

all disease claims. *See* Part V.H., *infra* pp. 597–598.

**26.** Dr. Wolf was appointed to the PCC on July 26, 1996, but resigned on October 10, 1996.

ment purposes or to answer troubling causation or liability issues common to the universe of claimants has a core element [—] representativeness—that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained.

*Id.* at 1019. The court continued:

The selected thirty ... cases included in the district court's "unitary trial" are not cases calculated to represent the group of 3,000 claimants. Thus, the results that would be obtained from the trial of these thirty ... cases lack the requisite level of representativeness so that the results could permit a court to draw sufficiently reliable inferences about the whole that could, in turn, form the basis for a judgment affecting cases other than the selected thirty. While this particular sample of thirty cases is lacking in representativeness, statistical sampling with an appropriate level of representativeness has been utilized and approved.

*Id.* at 1020. *See also E.K. Hardison Seed Co. v. Jones*, 149 F.2d 252, 256 (6th Cir.1945) (stating that to be valid "the sample portion should be of such nature as to be fairly representative"); *United States Steel Group v. United States*, 96 F.3d 1352, 1366 (Fed.Cir. 1996) (noting that to be reliable a sample must be representative); *Cimino v. Raymark Indus., Inc.*, 751 F.Supp. 649, 664 (E.D.Tex.1990) (concluding that the sample group must be representative of the group as a whole); John F. Shampton, *Statistical Evidence of Real Estate Valuation: Establishing Value Without Appraisers*, 21 S. Ill. U. L.J. 113, 124 (1996) (observing well established principle that if a statistical prediction is to be valid "the sample must be representative that is, an unbiased, random sample"); Michael J. Saks and Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts*, 44 Stan. L.Rev. 815, 841 (1992) ("Representativeness is the touchstone

of good sampling.").[27]  Inasmuch as the TCC's summary jury proposal provides that it and the Debtor would select the plaintiffs, it would seem to be subject to the same criticisms noted above. Additionally, there has been no showing that the TCC's proposal creates a sample—384 jury verdicts engineered from the trial of 24 plaintiffs—that is of sufficient size to enable the results to be extrapolated to all breast implants claimants with a statistically acceptable level of confidence. Robert G. Bone, *Statistical Adjudication: Rights, Justice and Utility in a World of Process Scarcity*, 46 Vand. L.Rev. 561, 577–87 (1993) (discussing the importance of both sampling size and representativeness); Saks and Blanck, 44 Stan. L.Rev. at 842 (discussing how sample size is an important factor in outcome accuracy).

### E. Two Other Possible Needs for Estimation

#### 1. *The Need for Estimation in Case of Attempted Cramdown*

█ If the class of personal injury claimants (or the subclass of breast implant claimants) rejected the Debtor's plan, the Debtor might seek cramdown under 11 U.S.C. § 1129(b)(2)(B). What about the need to estimate the aggregate amount of breast implant claims for purposes of defeating an attempted cramdown? Because the plan proposes that the Debtor's shareholders will retain their equity interests in the Debtor despite the possibility that breast implant claims will not be paid in full, it would be difficult (if not impossible) for the Debtor to cram down the plan over the dissent of that class of unsecured claims pursuant to 11 U.S.C. § 1129(b)(2)(B)(ii). If the Debtor instead relied on § 1129(b)(2)(B)(i) to attempt cramdown, it would be necessary to determine whether or not "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" (in short, whether the plan will in fact pro-

---

**27.** The Court by no means rejects the idea of sampling in this case. Indeed, under Part V.G., *infra* pp. 594–597, we recommend the use of sampling to determine damages in the event that the Debtor is found liable for the pending tort claims. However, to be reliable, the sample group must be selected at random and must be representative of the group or subgroup it is intended to reflect.

vide for full payment). In that case, an estimation of the aggregate amount of such claims might be needed. But this whole exercise presupposes that the class (or subclass) of claimants will vote to reject the Debtor's plan. Perhaps we should wait to see whether that occurs before embarking upon a long and complex estimation. For if the class of claimants nevertheless accepts the plan, there would be no need to hold a hearing under § 1129(b)(2)(B).

### 2. *Estimating Claims for Purposes of Voting on a Proposed Plan*

■ Another purpose for estimating unliquidated tort claims would be to determine whether the class has accepted or rejected the plan. As a threshold matter, the tort claimants would have to get past the fact that such claims will most likely have no vote because the Debtor has objected to each of these claims. 11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."); § 502(a) ("A claim ... is deemed allowed, unless a party in interest ... objects."). Therefore, before we get to the need for estimating these claims, the Court must first "temporarily allow the claim ... in an amount which the court deems proper for the purposes of accepting or rejecting a plan." F.R.Bankr.P. 3018(a).

Assuming that the implant claims were temporarily allowed for the purposes of voting on the plan, the Court would still have to determine how much each such claim is worth. Obviously, a claimant with no discernible illness should not have a claim equal in

amount to another claimant who is suffering grievously. *But cf. Menard–Sanford v. Mabey (In re A.H. Robins, Co.)*, 880 F.2d 694, 698 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error."); *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 646–47 (2d Cir.1988) (same). The estimation would then become extremely protracted as the Court would have to review the alleged symptoms of hundreds of thousands of claimants.

Because of the significant effort that estimation of this type would require, it is not an effort which should even be begun unless the need is real. For example, if the class of tort claimants rejects the plan by number, then there would be no need to value the claims cast. And, if the class accepts by such a super-majority, like in the cases cited above, it might be possible to say that under no circumstances could the aggregate value of rejecting claims equal a blocking $\frac{1}{3}+1$ minority vote. Only if the outcome of the "$\frac{2}{3}$ by amount" vote is unclear will it be necessary to embark upon this burdensome task.[28]

### F. Concluding Thoughts on Estimation

When dealing with a motion for estimation, a court starts with a baseline knowledge of what is involved with liquidating a claim. Therefore, the party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process. A court usually has a

---

**28.** If the result of the vote by the relevant class is not so clear as to declare a winner more or less by acclamation, the parties might be asked to consult with professionals to agree upon a grid. Such a grid could assign one unit to each claimant who is as yet asymptomatic, and additional units to each other claimant based upon the severity of her illness. Then each claimant who casts a ballot can be required, under penalty of forfeiting the right to further units, to present evidence in some agreed upon form to establish her right to additional units. In such a way, each seriously ill claimant will have a greater proportionate say in the outcome of the case than another claimant who is not suffering any ill effects of the implant.

One might say that this is a form of bias for presently ill over currently asymptomatic claimants. The response to that criticism, though, is

that, based upon experiences elsewhere, such as the M.D.L. registration, there are many, many more "claimants" who are merely preserving their rights than are making a claim for current symptoms. For example, the Command Trust Network, a self-described clearinghouse of information for silicone implantees, co-chaired by one of the members of the TCC, estimated that "[a]bout 100,000 [of the approximately 500,000 women who registered for the Global Settlement] have already experienced serious health problems, and the others are concerned they will fall ill as their implants deteriorate." *Setting the Record Straight: In Battle of Perceptions, Women Lose Out to Dow*, Command Trust Network Newsletter (National Silicone Implant Information Clearinghouse). By their number alone, then, these claimants will have a substantial say in the case's final outcome.

574

feel for when delay in a case becomes "undue." It is therefore incumbent upon the movant(s) to establish particulars as to why the delay which would be engendered by a typical liquidation would be undue in a particular instance. For the reasons stated above, neither movant has satisfied this burden.

Estimation has little to recommend it. Moreover, estimation only delays the inevitable. Eventually the contested claims of tort claimants will have to be liquidated. For many claimants, liquidation would likely occur through lengthy jury trials. Better that process begin sooner rather than later. Additionally, no good reason exists why the process of liquidating the claims cannot begin immediately. Since the deadline for filing a proof of claim has expired, there now exists a finite number of claimants possessing an opportunity to share in the Debtor's estate. The Debtor has filed objections to those claims which it opposes. If, in the near future, the parties do not come to some agreement, it will be necessary for the courts to assume that no agreement is likely and to proceed to litigation mode. That would trigger the hard part. How does the court system handle hundreds of thousands of objections to the allowance of personal injury claims? [29]

## V. An Aggregative Approach to Resolving the Pending Tort Claims

### A. Characteristics of Mass Tort Cases

Mass tort cases are characterized by several distinguishing features: (1) they involve large numbers of claims that are associated with a single product (i.e. breast implants, asbestos, Dalkon Shield); (2) among the various claims there is a "commonality of issues and actors;" and (3) there is an interdependence to the value of claims. Hensler and Peterson, 59 Brook. L.Rev. at 965; Richard A. Nagareda, *Turning From Tort to Administration*, 94 Mich. L.Rev. 899, 905 (1996); Coffee, 95 Colum. L.Rev. at 1358–59.

Mass torts are further complicated by two additional factors—"one temporal, the other geographic." Nagareda, 94 Mich. L.Rev. at 905–06. The temporal problem arises from the fact that the diseases caused by the product in question "do not strike immediately but develop quietly in the body over an extended period." *Id.* at 906. Consequently, mass torts typically involve "a latency period of many years or even decades between exposure to the harmful product and the onset of physical impairment." *Id.*

The geographic problem arises from the fact that plaintiffs are dispersed over a wide geographic area. *Id.* at 907. In this case, that geographic area is the entire world. Such geographic dispersion means that litigation proceeds in various federal and state courts around the country and oftentimes in foreign courts as well.

The large number of cases involved creates tremendous impediments to achieving a fair and final adjudication. Coffee, 95 Colum. L.Rev. at 1346 ("[T]he dilemma in mass tort

---

**29.** The Court is aware that presenting a view of how the case should proceed is somewhat unusual. However, in mass tort cases it is not unprecedented. *See, e.g., Findley v. Blinken (In re Joint Eastern and Southern Dists. Asbestos Litig.)*, 982 F.2d 721, 733 (2d Cir.1992), *modified on other grounds*, 993 F.2d 7 (2d Cir.1993) ("Especially in the course of a complex and continuing proceeding such as a bankruptcy reorganization, a judge has an entirely legitimate *judicial* role in suggesting constructive solutions and assisting the parties in achieving them."), *modified on other grounds*, 993 F.2d 7 (2d Cir.1993); *Cimino v. Raymark Indus., Inc.*, 751 F.Supp. 649, 652 (E.D.Tex.1990) ("The litigants and the public rightfully expect the courts to be problem solvers."). The Court does so now for the following reasons. First, the parties have asked us to do so in order to provide them with a touchstone for negotiation on a plan of reorganization. Second, this case has arguably reached an impasse. The parties have submitted their views on how this case should proceed in the form of the estimation motions. Those motions will, as noted, be denied. Nonetheless, the parties remain entrenched in their present unworkable solutions retarding further progress in this case. In fact, while the finishing touches were being placed on this Opinion, hearings were being held over a motion to terminate the Debtor's exclusivity on the grounds that negotiation over a proposed plan of reorganization has hopelessly stalled. *See In re Dow Corning Corp.*, 208 B.R. 661 (Bankr.E.D.Mich.1997). Therefore, the remainder of this Opinion constitutes serious recommendations intended to nudge the parties toward an agreement on how this case can be resolved fairly but expeditiously.

reform arises precisely because neither efficiency nor fairness, taken alone, is easily realizable."); Deborah R. Hensler and Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio–Legal Analysis,* 59 Brook. L.Rev. 961, 1030–31 (1993) ("[F]ew would disagree with the conclusion that ... [mass tort] cases have proved difficult to resolve efficiently and fairly."). For plaintiffs, long delays in the scheduling of trial dates can be expected. *Cimino,* 751 F.Supp. at 652 (observing the excessive length of time it takes to provide each plaintiff an individual trial in a mass tort case); William H. Schwarzer, Alan Hirsch and Edward Sussman, *Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute to Permit Discovery Coordination of Large–Scale Litigation Pending in State and Federal Courts,* 73 Tex. L.Rev. 1529, 1530 (1995) (delay is a common consequence of large-scale litigation); Hensler and Peterson, 59 Brook. L.Rev. at 963 ("[C]ases take an inordinately long time to reach disposition, sometimes concluding long after a plaintiff's death...."); Bone, 46 Vand. L.Rev. at 568 ("[T]rial opportunities for plaintiffs in large-scale mass tort cases are extremely scarce."); Edward F. Sherman, *Aggregate Disposition of Related Cases: The Policy Issues,* 10 Rev. Litig. 231, 238–39 (1991) (observing that court congestion caused by mass torts can prevent plaintiffs from getting their cases to trial); Deborah R. Hensler, *Resolving Mass Toxic Torts: Myths and Realities,* 1989 U. Ill. L.Rev. 89, 98 (1989) (discussing evidence that suggests opportunities for individual trials are infrequent in mass tort cases).

In addition, plaintiffs typically experience a loss of control over their case. Coffee, 95 Colum. L.Rev. at 1346 ("[I]ndividual plaintiffs have weak to nonexistent control over their attorneys across the mass tort context for reasons that are inherent to the economics of mass tort litigation."); Saks and Blanck, 44 Stan. L.Rev. at 840 ("[T]ort lawyers and their clients in mass tort cases communicate remarkably little about their cases and ... clients have little control over the course of the litigation."); Sherman, 10 Rev. Litig. at 249 ("[I]ndividual control of litigation is unavoidably affected by the exis-

tence of related cases"); Hensler, 1989 U. Ill. L.Rev. at 96 (noting that in mass tort cases the attorney-client relationship is "attenuated ... by the press of the sheer number of claims.").

And perhaps most importantly, plaintiffs who have obtained judgment often have great difficulty receiving prompt and adequate compensation for their claims. Jack B. Weinstein, *Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices* 141 (1995) (concluding that with respect to asbestos litigation—"If we persist in trying cases on an individual or even small-scale jurisdiction-by-jurisdiction basis, many plaintiffs will die before they are compensated, a great many will wait years, and some may receive nothing as the available monies are dribbled away by earlier awards and transaction costs.") [hereinafter Weinstein, *Individual Justice* ]; Schwarzer, Hirsch and Sussman, 73 Tex. L.Rev. at 1530 (observing that "frustration of victims' rights to compensation" is the norm in mass tort cases); Hensler and Peterson, 59 Brook. L.Rev. at 1031 (noting that claimants frequently wait years to receive compensation and when received the amounts paid can drastically vary between similarly situated plaintiffs); Bone, 46 Vand. L.Rev. at 568 (arguing that due to delay associated with mass torts, it is difficult "to assure a positive net recovery or an amount of compensation above a minimally acceptable level"); Sherman, 10 Rev. Litig. at 243 (observing that with mass torts, funds may be insufficient to compensate later claimants).

The funding problem is even more extreme when the temporal characteristic is considered. It is this temporal quality of mass torts that gives rise to the future claimant problem. Nagareda, 94 Mich. L.Rev. at 906 (identifying problems presented by temporal quality of mass torts); Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective,* 80 Cornell L.Rev. 941, 966 (1995) (noting valuation problems presented by presence of future claimants); Thomas A. Smith, *A Capital Markets Approach to Mass Tort Bankruptcy,* 104 Yale L.J. 367, 371–82 (1994) (discussing "fair distribution problem"

created by the presence of future claimants); Hensler and Peterson, 59 Brook. L.Rev. at 1045 ("The civil law is not well fashioned to deal with this latent injury process."); David Rosenberg, *The Causal Connection in Mass Exposure Cases: A 'Public Law' Vision of the Tort System*, 97 Harv. L.Rev. 849, 919 (1984) (commenting that the long disease latency periods—and thus the presence of future claimants—presents special difficulties in satisfying the compensation objectives of the tort system).

On the other side of the coin, the large number of cases spread over such a wide geographic area means that a defendant faces tremendous difficulties in fronting a meaningful defense. And when the temporal quality of mass torts is factored in, the extended duration of the litigation can have a potentially crippling effect on a defendant. For the judicial system, the combination of large numbers of plaintiffs, temporal dispersion and geographic dispersion combine to create an overwhelming and unmanageable litigation. Nagareda, 94 Mich. L.Rev. at 907.

## B. The Need for Aggregation

Given the characteristics of mass torts, what is the most appropriate method of liquidating the claims pending against the Debtor? There are three possible paths upon which liquidation could proceed: (1) settlement between the Debtor and tort claimants; (2) individualized adjudication of tort claims; or (3) some form of collectivized adjudication. *See* Saks and Blanck, 44 Stan. L.Rev. at 839.

With an eye towards fostering settlements, one approach would be to allow certain of the cases pending against the Debtor to proceed to trial. Upon the filing of its bankruptcy petition, Bankruptcy Code § 362(a) automatically stayed prosecution of the numerous breast (and other) implant cases that were and are pending against the Debtor in various state and federal courts around the country. When the stay went into effect, many of these cases were at advanced stages—much of the discovery was complete and the cases were nearly ready for trial. The Court could selectively lift the stay and allow some of these advanced cases to be tried. The Debtor asserts categorically that silicone is not toxic to humans, and the TCC categorically asserts that it is. If enough judicial decisions or jury determinations strongly predominate for one side's position, it may prompt the other side to abandon or alter its opposing position, thereby facilitating settlement. *See* Francis E. McGovern, *An Analysis Of Mass Torts For Judges*, 73 Tex. L.Rev. 1821, 1841–43 (1995) (identifying the various stages of a mass tort and explaining that when a mass tort reaches maturity the likelihood of a global resolution becomes more favorable); Coffee, 95 Colum. L.Rev. at 1439; Schuck, 80 Cornell L.Rev. at 949; Linda S. Mullenix, *Mass Tort Litigation and the Dilemma of Federalization*, 44 DePaul L.Rev. 755, 781 (1995).

Unfortunately, the number of jury verdicts needed to facilitate global settlement is unknown; though the concept of what makes a mass tort mature is generally understood, when a mass tort actually reaches that point is hard to pinpoint. If, as stated above, jury verdicts overwhelmingly predominate in favor of one side, it is conceivable that a global resolution could be reached in a fairly short period of time. Conversely, if the jury determinations tend to be more mixed the parties could potentially wage war for years before resolution is achieved. Moreover, while settlement can and should be both encouraged and facilitated by a court; it cannot be forced upon the parties.[30]

---

**30.** It is relevant to note that the fairness of mass tort global settlements has been called into question by numerous commentators. *See* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L.Rev. 1343, 1366–1403 (1995) (discussing the various conflicts that can arise in the context of mass torts that make a fair global settlement difficult to achieve and how a fair settlement is often times not even a primary concern of the negotiators); Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 Cornell L.Rev. 941, 961 (1995)

("[M]ass tort settlements encourage and pay, a large number of claims that are insubstantial...."); Deborah R. Hensler and Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio–Legal Analysis*, 59 Brook. L.Rev. 961, 1032 (1993) (arguing that negotiated settlements often "press[ ] defendants to settle cases in which liability [is] far from certain, and by forcing plaintiffs to accept compensation that reflect[s] their current and future losses poorly, at best." Moreover, such settlements, "rather

Consequently, if this method is adopted and quick resolution is not achieved, the liquidation process would degenerate into the traditional tort system where each plaintiff's case is tried one at a time. Obviously, attempting to adjudicate the hundreds of thousands of pending tort claims in this manner is not realistic. To begin with, the traditional approach would be unfair to the Debtor who would be forced into the impossible position of defending itself simultaneously in multiple courtrooms around the country. Not only would the Debtor be forced to trial in one or more venues without the benefit of its primary trial attorneys, but the Debtor's witnesses, particularly its experts, could not be in two (or more) places at the same time.

Since forcing numerous simultaneous trials upon the Debtor would be unjust, the thousands of lawsuits would have to be tried more or less one at a time. However, the trial of a breast implant lawsuit routinely lasts several weeks. (The 1994 trial of Gladys Laas and Jennifer Ladner against Dow Corning Corp. reportedly took 11 weeks to try.) Moreover, in some cases discovery is still ongoing. And even in those cases where discovery was essentially complete when the Debtor filed for bankruptcy, the Court can only assume that the passage of time will have created a need for some new discovery. Furthermore, human beings (and that includes attorneys) occasionally need some time off. Therefore, to be fair to the Debtor, it is unlikely that more than ten trials could ever be completed in a year. Finally, if one were to assume the impossible—that one trial could be completed every work day—it would take more than 1,900 years to provide trials for each of the approximately half million claimants.

Implementation of the traditional tort system would be equally unfair to the tort claimants. Failure to obtain a quick resolution would mean that the majority of the hundreds of thousands of tort claimants would never live to see the inside of a courtroom and thus never have an opportunity to receive compensation for their injuries. For this reason, the few early complaints voiced by attorneys for individual claimants that the filing of this bankruptcy case was a mere ploy to delay their clients' day in court, have always rung hollow. (What does an attorney who already has 600 clients advise the 601st about when her case will come to trial?—or perhaps more poignantly, what does the judicial system tell the 200,601st claimant about when she will get her day in court?) *See, e.g.,* Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (Or Found)?,* 61 Fordham L.Rev. 617, 619 (Dec. 1992) ("Can one attorney or firm properly serve hundreds, let alone thousands, of clients?"); *see also id.* at 619 n. 9.

■ The inescapable conclusion is that the traditional tort system simply does not work in mass tort situations like the one facing the Debtor. In fact, the legal community overwhelmingly concurs on this point. *See* Coffee, 95 Colum. L.Rev. at 1346 (noting the generally accepted view that the traditional tort system must be modified substantially for courts to be able to adjudicate mass torts effectively); *id.* at 1358–59 (noting that the dynamics of mass torts tend[ ] to undercut the traditional ideal of litigant autonomy); Bone, 46 Vand. L.Rev. at 568 n. 19 (observing that the Judicial Conference Ad Hoc Committee on Asbestos Litigation had recently concluded: "It is unrealistic to believe that individual trials can provide relief. The local trial of an individual asbestos claim

than adjudication of the facts and law—provide little or no opportunity for plaintiffs publicly to voice their feelings that they have been wrongfully harmed by defendants or, for defendants who believe that they are not blameworthy, to vindicate themselves."); Robert G. Bone, *Statistical Adjudication: Rights, Justice and Utility in a World of Process Scarcity,* 46 Vand. L.Rev. 561, 575–76 (1993) (discussing how inherently long trial delays associated with mass torts forces plaintiffs to accept settlements that would otherwise be unacceptable, causing mass tort settle-

ments to often be coercive); Michael J. Saks and Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trials of Mass Torts,* 44 Stan. L.Rev. 815, 839 (noting the extreme dissatisfaction plaintiffs often have with mass tort settlements); John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action,* 54 U. Chi. L.Rev. 877, 879 (Summer 1987) (stating how mass tort settlement values often have little relationship to the underlying merits of the case).

takes so long that trying each claim separately would require all the civil trial time for the foreseeable future to the exclusion of all other cases in districts with heavy asbestos caseloads."—*Report of the Judicial Ad Hoc Committee on Asbestos Litigation* at 19 (March 1991)); Hensler and Peterson, 59 Brook. L.Rev. at 962–63 ("[A]lmost all of those involved would agree that the civil justice system has not performed well in response to the challenge of mass torts. The litany of criticisms is long and familiar: cases take an inordinately long time to reach disposition, sometimes concluding long after a plaintiff's death; outcomes are highly variable, often seeming to have little relationship to plaintiffs' injuries or defendants' culpability; transaction costs are excessive, far outstripping the amounts paid out in compensation."); Judith Resnik, *From "Cases" to "Litigation"*, 54 Law & Contemp. Probs. 5, 66 (Summer, 1991) ("As many have documented, [the traditional tort] system's commitment to litigant autonomy, attorney fidelity, fair and accurate decisionmaking, and public interaction has not been uniformly borne out in practice nor made available to many would-be litigants."); Hensler, 1989 U. Ill. L.Rev. at 89–90 ("In the cold light of the failure . . . to resolve mass torts, a consensus has now emerged calling for substantial modifications in traditional court processes to improve the efficiency and equity of the mass claims resolution process."); Rosenberg, 97 Harv. L.Rev. at 900 ("The system's case-by-case mode of adjudication makes mass exposure litigation needlessly expensive by requiring separate and repeated determinations of various complex issues, such as those regarding causation, that are common to all the claims arising out of any single mass exposure event. Besides squandering the system's resources, the duplicative adjudication of common questions generally places mass exposure claims at a competitive disadvantage in the claims market and deprives the system of their deterrence value. But the courts' traditional passive role inhibits resort to interventionist methods that might reduce litigation costs, enable the claims market to reflect the relative deterrence values of competing mass exposure and sporadic accident claims, and inform potential claimants of their rights to sue or to join pending litigation."); David Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means*, 62 Ind. L.J. 561 (1987).

This conclusion does not ignore the fact that aggregation also has potential areas of concern. To begin with, aggregation has the potential for corroding an individual's ability to control her own claim. Schwarzer, Hirsch and Sussman, 73 Tex. L.Rev. at 1547; Sherman, 10 Rev. Litig. at 247; Hensler, 1989 U. Ill. L.Rev. at 91. But, as noted *supra* p. 575, the loss of individual autonomy seems to be unavoidably endemic to mass tort cases.[31]

There is also concern that aggregation can lead to inaccurate compensation measurements—with some plaintiffs receiving too much and others receiving too little. Resnik, 54 Law & Contemp. Probs. at 65; Hensler, 1989 U. Ill. L.Rev. at 92. However, such concern can be substantially eliminated, as will be discussed below, through the implementation of a tiered general causation determination and a well designed sampling methodology to determine specific causation and damages.

The efficient management of a large number of claims by a single court is another concern of aggregation, Schwarzer, Hirsch and Sussman, 73 Tex. L.Rev. at 1547–48, though such management concerns are already part and parcel of this bankruptcy case.

Aggregation can deny plaintiffs their choice of forum. Sherman, 10 Rev. Litig. at 253. Again, however, since all claims against the *Debtor* are pending before this Court, this is a nonissue.

When a large number of cases are aggregated, there are bound to be certain issues that are unique to individuals or subgroups of plaintiffs. *See* Schwarzer, Hirsch and Sussman, 73 Tex. L.Rev. at 1548. Though as will be discussed below, this problem can be

---

31. In fact, some argue that the loss of individual control over one's case is a serious problem that pervades our entire legal system, not just mass torts. *See* Deborah R. Hensler, *Resolving Mass Toxic Torts: Myths and Realties*, 1989 U. Ill. L.Rev. 89, 92–97 (1989).

adequately dealt with through bifurcation of trials, creation of subgroups to adjudicate issues specific to the group, use of linear regression in specific causation and damage determination and, if necessitated, individual adjudication of certain issues.

In addition, with aggregation, negative effects have the potential to be magnified in the sense that "[i]f an error occurs, both the number of parties and the potential impact, will be greater than in the ordinary case management process." Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L.Rev. 659, 694 (1989).

And there is the concern that both plaintiffs and defendants may be denied the constitutional guarantees of due process and the right to a jury trial. Bone, 46 Vand. L.Rev. at 566–67 & n. 16; Saks and Blanck, 44 Stan. L.Rev. at 815; Sherman, 10 Rev. Litig. at 251. Nonetheless, the Court is of the firm opinion that through the careful and prudent design and implementation of the proposal detailed below the legitimate rights of all parties can be safeguarded.

In any event, the point cannot be stressed enough that use of the only alternative to aggregation—individualized adjudication of tort claims—would be "tantamount to denying [most] litigants their due process ... rights altogether." Saks and Blanck, 44 Stan. L.Rev. at 826. By default, then, some form of collective remedy is mandated. *See* Weinstein, *Individual Justice* 1; Kenneth R. Feinberg, *Response to Deborah Hensler, A Glass Half Full, A Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation*, 73 Tex. L.Rev. 1647, 1648 (1995) (stating that with respect to the efficient treatment of mass torts: "The answer is aggregation. Aggregation. You must get all of the cases in one forum. Until you do that, any piecemeal solution, however beneficial it may be, does not offer either the plaintiff or the defendant

global peace."); Coffee, 95 Colum. L.Rev. at 1345–46 (recognizing judicial system's fundamental movement toward collectivized treatment of mass torts, strongly supporting this trend, and concluding that any attempt to "return to a traditional system of individual case litigation" would be "quixotic [and] ... costly"); Schwarzer, Hirsch and Sussman, 73 Tex. L.Rev. at 1550 ("[T]he growth of large-scale litigation may eventually leave no alternative to aggregation procedures if the court's adjudicatory function is to survive."); Schuck, 80 Cornell L.Rev. at 958 ("The number of individual claims currently pending and reasonably anticipated in the future is in some mass tort litigations so large that it is simply not practicable to provide individual trials in the traditional fashion."); Hensler and Peterson, 59 Brook. L.Rev. at 1031 ("Efficient disposition of a large volume of litigation concentrated within one or a small number of courts requires some type of aggregative or collective procedure."); Sherman, 10 Rev. Litig. at 231 *passim* (recognizing value of aggregating related cases and discussing ways in which current barriers to aggregation can be overcome); Resnik, 54 Law & Contemp. Probs. at 21 ("[M]ost agree that aggregate processing—in some forum—and aggregate treatment of some mass torts in federal courts are essential."); *id.* at 45 (concluding that the question "is not whether to aggregate mass torts but what if any limits to impose"). Indeed, bankruptcy itself is a collective remedy. How then does bankruptcy accommodate the peculiar carve-out (which is the frustrating cause of so much of the problems in this and other mass tort bankruptcy cases) granted to personal injury and wrongful death claims?

## C. Consolidation Under Rule 42

Because bankruptcy has so many of the hallmarks of a class action,[32] the easy an-

---

32. Class actions are provided for by F.R.Civ.P. 23, which states in pertinent part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue ... as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims

... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

swer would be to form the breast implant claimants into a class. *See In re Farah*, 141 B.R. 920, 928 n. 7 (Bankr.W.D.Tex.1992) (discussing how bankruptcy is closely analogous to a class action since it creates a common pool of assets for the benefit of all potential creditors/claimants); Richard B. Sobol, *Bending the Law: The Story of the Dalkon Shield Bankruptcy,* 70 (1991) ("On a theoretical level, the concept of a class action in the bankruptcy to resolve Robins's Dalkon Shield liability made little sense. Because of the collective and compulsory nature of bankruptcy proceedings, a Chapter 11 case is in essence a mandatory class action, with the official committee as the representative of the class of creditors but without the necessity of satisfying an additional set of technical and difficult requirements from class action law.") [hereinafter Sobol, *Bending the Law* ]; Luisa Kaye, *The Case Against Class Proofs of Claim in Bankruptcy,* 66 N.Y.U. L.Rev. 897, 897 (1991) (likening bankruptcy law to class actions); 3 Herbert B. Newberg, *Newberg on Class Actions,* § 20.01 at 581 (2d ed.1985) (characterizing bankruptcy cases as "statutory class actions"); Judith Resnik, Dennis E. Curtis and Deborah R. Hensler, *Individuals Within The Aggregate: Relationships, Representation, And Fees,* 71 N.Y.U. L.Rev. 296, 298 (1996) (observing that bankruptcy and class actions are similar in that both seek to achieve resolution of multiple claims against a single party through aggregation); Jack B. Weinstein, *Ethical Dilemmas In Mass Tort Litigation,* 88 Nw. U.L.Rev. 469, 477 (same); Patrick D. Shaw, *See No Evil, Speak No Evil: Discharging CERCLA Claims in Bankruptcy Without Notice,* 6 Tul. Envtl. L.J. 127, 149 (1992) (same).

Significantly, breast implant plaintiffs sought and obtained class certification under Rule 23 or its state-law or Canadian-law equivalent in several of the lawsuits now pending against the Debtor. *See Dante v. Dow Corning Corp.,* 143 F.R.D. 136 (S.D.Ohio 1992); *Spitzfaden v. Dow Corning Corp.,* No. 92–2589 (La.Dist.Ct.); *Harrington v. Dow Corning Corp.,* No. C954330 (British Columbia Sup.Ct.1996); *Doyer v. Dow Corning Corp.,* No. 500–06–000013–934 (Quebec Sup.Ct.1994); *Bendall v. McGhan Medical Corp.,* 106 D.L.R. 4th 339, 14 O.R.3d 734 (Ontario Ct. Gen. Div.1993). In each of these cases, the question of silicone's pathogenicity was identified as a common issue. *Compare Bendall v. McGhan Medical Corp.,* File No. 14219/93, Order entered October 22, 1993 ("Are silicone gel breast implants likely to cause specific medical conditions?") *with Harrington,* slip opinion at 24 ("Are silicone gel breast implants reasonably fit for the intended purpose?") *and Doyer,* slip opinion at 22 ("Are silicone breast implants manufactured and sold by the defendants defective in design, composition and manufacture?" (translated from French)) *and with Spitzfaden,* Case Management Order, dated March 13, 1997, p. 2 ("Did silicones cause the injuries complained of in these plaintiffs?").

As indicated earlier, the Debtor not only concedes, but adamantly maintains, that the pathogenicity issue is common to all the breast implant claims pending against it.

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

And while the TCC opposes a single, general causation trial, its own key witness acknowledged that much of his testimony is "generic"—i.e., repeated in one implant case after another. Transcript, July 19, 1996, at 183–94 (Testimony of Dr. Eric Gershwin). Thus class certification would seem to be a logical mechanism by which to proceed here. *See also In re Silicone Gel Breast Implants Products Liability Litigation,* 793 F.Supp. 1098, 1100 (Jud.Pan.Mult.Lit.1992) ("The actions present complex common questions of fact ... on the issue of liability for allegedly defective silicone gel breast implants."); *see generally In re American Medical Systems, Inc.,* 75 F.3d 1069, 1081 (6th Cir.1996) (The MDL Panel's refusal to consolidate is a relevant factor in considering whether to certify a class).

Matters may not be quite that simple, however. For one thing, both of the moving parties are apparently disinclined to resort to Rule 23. Transcript, July 19, 1996, at 18, 21. If certification were sought under Rule 23(b)(3), moreover, satisfaction of that provision's "predominance" requirement could prove to be particularly problematic. *See Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)

("Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard.... Differences in state law ... compound these disparities."); *American Medical Systems,* 75 F.3d at 1084, 1089 (expressing doubt as to whether the predominance requirement can be met "[i]n product liability actions," although declining "to say that a class action in such a context will never be appropriate").[33]

Faced with these potential obstacles to class certification, it is perhaps fortunate that the Federal Rules of Civil Procedure provide for an alternative form of collective litigation. Rule 42 provides:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings there-

---

**33.** In this regard, it bears noting that "... an action may be brought or maintained as a class action with respect to particular issues, or ... a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." F.R.Civ.P. 23(c)(4). Speaking about the similar Canadian class action law, Justice Mackenzie of the British Columbia Supreme Court observed that, "if a threshold issue can be identified which is common to all claims, that issue can be litigated in a class action format, leaving individual issues to be dealt with later in separate trials if necessary, depending on the outcome of the threshold issue." *Harrington v. Dow Corning Corp.,* No. C954330 at 14–15 (British Columbia Supreme Court, April 11, 1996). Other commentators, discussing our version of the class action rule, agree.

Class treatment ... has been extended solely to the common questions of law and fact concerning liability, preserving the right to an individual trial on damages. In some cases courts have gone slightly beyond the conventional bifurcation of liability and damage elements of the tort cause of action. They have instead designated certain common liability issues for class treatment, while remanding the remaining liability questions relating to the

circumstances of each class member to an individual trial before, or along with, determination of damages.

David Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 Ind. L.J. 561, 569 (1987). And as a respected treatise observed, "[t]he effect [of Rule 23(c)(4)] may be to make the common issues in the recast class action 'predominate' for purposes of Rule 23(b)(3)." 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 1778.

Some courts, however, have rejected the proposition that Rule 23(c)(4) can be utilized in this manner. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 745–46 n. 21 (5th Cir.1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."); *Arch v. American Tobacco Co.,* No. CIV. A. 96–5903, 1997 WL 312112, at *25 (E.D.Pa. June 3, 1997) ("Plaintiffs cannot read the predominance requirement out of (b)(3) by using (c)(4) to sever issues until the common issues predominate over the individual issues.").

in as may tend to avoid unnecessary costs or delay.

The purpose of this rule is to permit the Court to conduct its "business 'with expedition and economy.'" *Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (6th Cir.1992) (quoting 9 Wright & Miller, *Federal Practice and Procedure*, § 2381 (1971)). The question of "[w]hether cases . . . should be consolidated for trial is a matter within the discretion of the trial judge." *Stemler v. Burke*, 344 F.2d 393, 396 (6th Cir.1965).

■ It is fairly obvious that there is a factual question common to all the implant claims—namely, whether silicone is pathogenic. This proposition—that each of the breast implant claims includes a contention that silicone is harmful to humans—strikes us as incontrovertible, and no party has seriously disputed it. It is therefore not surprising that in all of the cases which have been certified as class actions some variation of this question is listed as the common issue. It is therefore abundantly clear that those courts which have considered the issue have routinely held that a common, if not threshold, issue in all breast implant personal injury lawsuits is whether the silicone gel in the implants can cause women physical injuries when it escapes its container. This fact is very strong support for seeking the answer to this question in a single trial, as the Debtor proposes.

The TCC's key witness on the alleged harmful effects of silicone gel in the human body was Dr. Eric Gershwin, a medical doctor specializing in immunology and internal medicine at the Davis Campus of the University of California. He testified at length about selected scientific literature on, among other things, certain properties of silicone, and about his experiences treating women with ailments he attributed to their implantation with silicone-gel breast implants. Transcript, July 19, 1996, at 32–121. Dr. Gershwin admitted to having testified as an expert witness for plaintiffs in approximately 20 breast implant cases, *id.* at 122–23; that he earned $500 an hour for the first hour of deposition time and $750 for each additional hour; that the money so earned went first to the UC–Davis Medical School, but that if there was a surplus, the faculty member who earned the money got to keep it. *Id.* at 195–96. He had a financial incentive to oppose a single general causation trial since his services would no longer be in demand thereafter. And he fought the Debtor's counsel very hard before eventually conceding that large parts of his testimony were "generic" in that he repeats it in case after case. *Id.* at 183–94.

"This reliance on documents and 'canned' testimony . . . is particularly noticeable in mass tort suits where identical testimony by the same relatively small group of experts is presented in case after case." Weinstein, *Individual Justice*, 129; *see also* Rosenberg, 97 Harv. L.Rev. at 900, 905 ("The claims that do manage to gain access to the system are redundantly adjudicated at a disproportionately high cost to plaintiff attorneys and at lavish administrative expense. . . ."). The tremendous inefficiencies borne by the judicial system by accommodating individual trials involving repetitious testimony is one of the strongest justifications for consolidating multiple cases into a single trial. For purposes of Rule 42(a), then, it is obvious that these claims "involv[e] a common question of . . . fact."

■ Of course, that finding would not end the inquiry under Rule 42(a). Other considerations which the court must take into account include whether consolidation promotes judicial efficiency, *see Advey*, 962 F.2d at 1180; and whether consolidation can be effected without compromising justice.

■ Turning first to considerations of justice, the court must assess "the risks of prejudice and confusion [that would] result[ ] from consolidation." *Drago v. Celotex Corp.* (*In re Joint Eastern & Southern Dists. Asbestos Litig.*), 125 F.R.D. 60, 63 (E. & S.D.N.Y.1989). With respect to the latter, it is clear that the potential for confusion would increase to the extent that the evidence adduced at trial is relevant only to a subset of the plaintiffs whose actions have been consolidated. Under these circumstances, the factfinder has the formidable chore of pigeonholing evidence—taking it into consideration for some claims, while disregarding it for others.

See Cain v. Armstrong World Indus., 785 F.Supp. 1448, 1457 (S.D.Ala.1992) (ordering a new trial, and observing that "[a]s the evidence unfolded ..., it became ... obvious ... that a process had been unleashed that left the jury the impossible task of being able to carefully sort out and distinguish the facts and law of thirteen plaintiffs' cases that varied greatly"); cf. Debruyne v. National Semiconductor Corp. (In re Repetitive Stress Injury Litig.), 11 F.3d 368, 374 (2d Cir.1993) ("A party may not use aggregation as a method of increasing the cost of its adversaries—whether plaintiffs or defendants—by forcing them to participate in discovery or other proceedings that are irrelevant to their case."), reh'g, 35 F.3d 637 (2d Cir.1994).

In this case, however, the risk of overwhelming the factfinder can be greatly reduced by resort to Rule 42(b), which provides:

> (b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by statute of the United States.

F.R.Civ.P. 42(b). Courts are generally afforded considerable latitude in determining whether to invoke this rule. See Hoffman v. Merrell Dow Pharm., Inc. (In re Bendectin Litig.), 857 F.2d 290, 316 (6th Cir.1988) ("In reviewing the district court's decision to trifurcate we ... note Rule 42 which 'giv[es] the court virtually unlimited freedom to try the issues in whatever way trial convenience requires.'" (citation omitted)); Hines v. Joy Mfg. Co., 850 F.2d 1146, 1152 (6th Cir.1988) ("[T]he appellate court will leave a great deal to the discretion of the trial court" in reviewing an order for bifurcation. (quoting 9 Wright & Miller, Federal Practice and Procedure, § 2392 (1971))).

As with Rule 42(a), judicial efficiency is a major objective of Rule 42(b). See Bendectin Litig., 857 F.2d at 317. And perhaps the most obvious way that this can be achieved is by isolating a threshold issue which, depending on its resolution, could obviate the need for further proceedings:

> Many courts have ... permitted separate issue trials when the issue first tried would be dispositive of the litigation. The courts do so because the efficiency of the trial proceedings is greatly enhanced when a small part of the case can be tried separately and resolve the case completely.... 'This procedure should be encouraged because court time and litigation expenses are minimized'... '[T]he plaintiffs can never win a case if they can't prove the [defendant's] drug caused the problem. That is a central issue in this case.'... '[A]ll claims depended upon the answer to a single question: Does Bendectin, taken in therapeutic doses cause birth defects?'

Id.

Along the same lines is Kiser v. Bryant Elec. (In re Beverly Hills Fire Litig.), 695 F.2d 207 (6th Cir.1982), where the court approved as "reasonable" the trial court's order under Rule 42(b) for a separate "causation" trial. Id. at 216. The lower court's rationale for bifurcation went as follows:

> This is a class action on behalf of approximately 200 persons against 23 defendants.... The parties estimate that approximately 40 trial days will be required for the presentation of several hundred witnesses. Critical to plaintiffs' case is the issue of causation. Before any determination of liability upon any of the defendants can be made, it must be established that "old technology" aluminum wire either caused or contributed to the fire.... While such establishment does not in and of itself determine liability of any or all of the defendants, a negative determination would free them from such liability. There is reason to believe that a determination of this issue would materially reduce the time required to try this case.

Id. at 216 n. 14 (citation omitted). Of particular significance here is the Sixth Circuit's observation that "whether resolution of a single issue would likely be dispositive of an entire claim is highly relevant in determining

the efficacy of bifurcation." *Id.* at 216; *see also Richmond v. Weiner,* 353 F.2d 41, 44 (9th Cir.1965) (stating that an issue may be tried separately if "that course would save trial time or effort or make the trial of other issues unnecessary."); *McElroy v. Arkansas Log Homes, Inc.,* No. 82–1642–C, 1989 WL 18755, *1 (D.Kan. Feb.13, 1989) (citing "the savings in time and expense in trying first the dispositive issue of causation" pursuant to Rule 42(b)).

A determination that silicone is bio-inert would, in one fell swoop, fully or partially dispose of many thousands of implant claims.[34] *See generally* Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases,* 46 Stan.L.Rev. 1, 14 (1993) ("In mass tort cases, proof of causation ... [includes] general causation[, which] ... asks whether exposure to a substance causes harm to anyone.... Under traditional tort theory, a plaintiff must prevail by a preponderance of the evidence on ... [this] question[ ] to succeed.").

A contrary determination, while not dispositive,[35] would likely have a favorable impact on settlement prospects. *See Beverly Hills Fire Litig.,* 695 F.2d at 216 n. 14 ("[I]t is entirely possible that a [finding of causation] ... might enhance the likelihood of settlement." (quoting the trial judge)); *Ford v. Continental Airlines Corp. (In re Air Crash Disaster at Stapleton Int'l Airport),* 720 F.Supp. 1455, 1459 (D.Colo.1988). Indeed, if it were established that the Debtor has liability to the tort claimants, this case would then fall into the familiar mass tort bankruptcy model,[36] virtually all of which were resolved by negotiated plans of reorganization. Thus, the Sixth Circuit's reasoning in the cases cited above applies with equal force here. And with the object of the trial limited in this fashion, there will be no need for jurors to perform mental gymnastics: they will consider the entire record in deciding whether silicone is harmful. *See Bendectin Litig.,* 857 F.2d at 315 ("[T]he narrowing of the range of inquiry through trifurcation substantially improved the manageability of the presentation of proofs by both sides and enhanced the jury's ability to comprehend the causation issue."); Sanders, 46 Stan. L.Rev. at 76 ("Jurors have special difficulty understanding statistical evidence, and [in mass tort cases] courts can justify bifurcation as a means of reducing jury confusion."); *compare In re Joint Eastern and Southern District Asbestos Litigation,* No. 88 Civ. 4213, 1990 WL 4772, at *5 (S.D.N.Y. Jan.16, 1990) ("[T]he presentation of the state of the art evidence, offered for the issues of product defectiveness and punitive damages, has become standardized in that it differs little from trial to trial and is not specifically tailored to a particular plaintiff's case."). Thus

---

**34.** While all of the implant claims allege that silicone is toxic, some also seek damages based on independent allegations—such as the need for surgical removal of the implant following rupture.

**35.** The primary issues remaining for trial would be (1) whether the plaintiff was in fact injured by her exposure to silicone (the so-called "specific causation" element of the case, *see* Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases,* 46 Stan.L.Rev. 1, 14 (1993)); and (2) damages. *See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1200 (6th Cir.1988); *DeLuca v. Merrell Dow Pharm., Inc.,* 911 F.2d 941, 958 (3d Cir.1990); *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873, 875 (W.D.Tex.1997) ("In order to establish her claim, the Plaintiff must show both general and specific causation—that is, that breast implants are capable of causing the condition she complains of, and that her breast implants were the cause-in-fact of her specific condition."); *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1412–13 (D.Or.1996) ("Courts ... have recognized two levels of causation: general causation (i.e., whether silicone gel can cause disease in anyone) and specific causation (i.e., whether silicone gel breast implants caused disease in this plaintiff)."); Hensler and Peterson, 59 Brook.L.Rev. at 1034 ("The plaintiff first must establish that the type of product use or exposure that she alleges is capable of causing her alleged injuries (general causation), and then establish that this use or exposure was the cause-in-fact of injury in this case (specific causation).").

**36.** It has been apparent from the inception of this case that this case does not sufficiently resemble the mass tort cases which preceded it. In virtually every one of those, the debtor had accepted liability to the class or tort claimants and the issues were limited to how much was owed to this class and how best to pay it. In the present case, on the other hand, the biggest issue is the threshold question of whether Dow Corning has any liability to the tort claimants. Only if that question is answered affirmatively will this case resemble the model.

the use here of Rule 42(b) would eliminate the risk of jury confusion that consolidation under Rule 42(a) would otherwise present.

Still on the question of the potential for prejudice, some courts have expressed concern that collective litigation will force the defendant to pay an artificially inflated price in exchange for settling the actions. *See, e.g., In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1298 (7th Cir.1995) (indicating that class certification, by raising the specter of a single, very large judgment in favor of the class, exposes the defendant to "intense pressure to settle"). That is of no concern here, though, as the Debtor is unequivocally in favor of aggregating the claims against it for purposes of determining silicone's toxicity, and is already in bankruptcy.

■ Justice may also be compromised if the factfinder is expected to apply different legal standards to different subsets of the consolidated actions. *See, e.g., Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* No. 93 CIV. 8197, 1996 WL 140251, *3 (S.D.N.Y. Mar.27, 1996). Thus while a nontoxicity finding would probably have the same legal effect in all jurisdictions, the applicable law may vary in other respects, such as with regard to proof requirements. *See Bendectin Litig.,* 857 F.2d at 312 ("[A] federal court in a diversity case must apply the state court's burden of proof rules.").

But rather than resigning oneself to the conclusion that there is an unacceptable risk of jury confusion as to what law applies to whom, the appropriate response would be to subdivide the trials. After all, it makes more sense to conduct, say, four consolidated separate trials (each one comprised of plaintiffs subject to the same substantive law standard), than to proceed to try individually each of the thousands of implant claims. *See Wilson v. Johns–Manville Sales Corp.,* 107 F.R.D. 250, 252 (S.D.Tex.1985) ("The individualistic nature of these issues [regarding the plaintiffs' exposure to, and injuries from, asbestos fibers] ... does not preclude the Court from implementing a procedure to efficiently and fairly resolve ... [them].... [R]ather than conducting 50 individual trials, the[se] residual issues will be resolved by trying the cases in groups of five.").

■ Regarding the matter of efficiency, it must be borne in mind that, unlike a class action, "consolidation of separate actions does not merge the independent actions into one suit." *Advey,* 962 F.2d at 1180; *see also* Charles Silver, *Comparing Class Actions and Consolidations,* 10 Rev.Litig. 495, 497 (1991) ("[A] class action is a single lawsuit that binds a large number of people, while a consolidation is a set of independent lawsuits that are processed in a coordinated and relatively efficient way. Class certification joins all parties in a single massive suit in which most parties occupy a passive role; a consolidation order neither joins parties nor merges suits nor alters parties' procedural rights.") (footnote deleted). At least in theory, then, each of the thousands of plaintiffs in a consolidated silicone-toxicity trial would have the same autonomy as she would enjoy in the absence of consolidation.

The perceived need to rectify this situation has prompted "judges [to] regulate consolidations in many ways[, such as by] ... insist[ing] on consolidated complaints and vest[ing] lead counsel with substantive control of the litigation, including the power to reject motions, interrogatories, and discovery requests submitted by other attorneys, subject to judicial review." *Id.* at 513. Effective as these methods may be in achieving their purpose, however, they are difficult to square with the "non-merger" principle mentioned above. *See id.* at 515–16; *see also* Richard L. Marcus, *Confronting the Consolidation Conundrum,* 1995 BYU L.Rev. 879, 890 ("Consolidation is not supposed to diminish a party's control over its case.... But the reality is often otherwise....").

The criticism that consolidation should not be permitted to reduce a plaintiff's ability to control his/her litigation is certainly subject to debate. *See supra* pp. 577–578; *see generally,* Joan Steinman, *The Effects of Case Consolidation on the Procedural Rights of Litigants: What They Are, What They Might Be, Part I: Justiciability and Jurisdiction (Original and Appellate),* 42 UCLA L.Rev. 717 (1995), and *The Effects of Case Consolidation on the Procedural Rights of Litigants: What They Are, What They*

*Might Be, Part II: Nonjurisdictional Matters,* 42 UCLA L.Rev. 967 (1995). Even if accepted at face value, moreover, there is reason to believe that there would be no need here to resort to extraordinary judicial measures as a means of controlling case administration. First, the plaintiffs in a consolidated action have an incentive to voluntarily coordinate their trial strategy, thereby avoiding repetitive and wasteful efforts on their part. *See* Silver, 10 Rev.Litig. at 516 ("Because lawyers, like judges, benefit from consolidation by avoiding unnecessary duplication, and because lawyers are better placed than judges to structure consolidations in ways that achieve economies of scale and guard against inadequate representation, it seems wise to rethink the policy of removing control over the institutional structure of consolidations from lawyers' hands."). Because it is decidedly in their best interest to present a united front in a consolidated toxicity trial, there is good reason to believe that they will do just that.

A second reason has to do with the nature of the common issue. Resolution of the question of silicone toxicity necessarily must focus on scientific data, population studies, and expert testimony. *See Todd v. Merrell Dow Pharm., Inc.,* 942 F.2d 1173, 1179 (7th Cir.1991) ("To establish a causal relationship between a particular product and alleged injuries, a plaintiff generally presents credible expert witness testimony."); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990) (affirming summary judgment for the defendants based on lack of proof of causation, observing that "[i]t is crystal clear that Mrs. Garside had no scientific knowledge as to causation and was incompetent to testify"); *Fitzgerald v. Manning,* 679 F.2d 341, 350 (4th Cir.1982) ("[P]roof of causation ... requires expert testimony.... The only exception ... is the unusual case 'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge'" (citation omitted)); Sanders, 46 Stan.L.Rev. at 13 ("[A] plaintiff's proof of causation must be based primarily on analyses of the chemical and physical attributes of the agent and on the agent's effect on animal and human subjects."); *see generally Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, there would be no need for testimony from plaintiffs regarding their implant experiences. *Cf. Helminski v. Ayerst Labs.,* 766 F.2d 208, 212 (6th Cir.1985) ("[T]he severity of [the plaintiff's] condition ... was not relevant to the issue of whether Fluothane caused the injury."); *In re Richardson–Merrell, Inc. "Bendectin" Prods. Liab. Litig.,* 624 F.Supp. 1212 (S.D.Ohio 1985) (a multi-district, bifurcated causation trial in which only expert witnesses testified), *aff'd, Bendectin Litig.,* 857 F.2d 290. Indeed, the exclusion of all or most evidence regarding the nature or extent of each plaintiffs' alleged symptoms would likely promote fairness, and hence is further justification for invoking Rule 42(b). *See Crummett v. Corbin,* 475 F.2d 816, 817 (6th Cir.1973) ("Appellant contends that she was prejudiced by the fact that the jury was unable to consider evidence respecting her injuries in making its findings on the question of liability. Such consideration of evidence not related to the question of liability appears to be a type of prejudice which is to be avoided by separating the issues of liability and damages under Rule 42(b)."); *Hines,* 850 F.2d at 1152 (reaffirming *Crummett, supra* ); *Beauchamp v. Russell,* 547 F.Supp. 1191, 1199–1200 (N.D.Ga.1982) ("In order to avoid potential prejudice, it would be preferable to permit the jury to concentrate on the complicated issue of liability without considering evidence on the extent of [the plaintiff's] ... injuries ...."); *see generally Helminski,* 766 F.2d at 217 ("[W]e must safeguard the jury's ability to decide the case based upon the evidence presented rather than emotional factors.... If the court in its discretion determines that the party's presence would, indeed, be prejudicial, the court may bifurcate the proceedings into separate trials on liability and damages, excluding the litigant from the liability phase."); Sanders, 46 Stan.L.Rev. at 74–75 ("Within the context of mass exposure cases ..., the benefits of bifurcation extend beyond saving resources. Courts should adopt bifurcation, even in single plaintiff-single defendant cases, primarily because it would reduce prejudice arising from the failure of juries to give sufficient weight to the issue of causation.... Evidence also indicates that

bifurcated trials produce superior outcomes.");[37] Judyth W. Pendell, *Enhancing Juror Effectiveness: An Insurer's Perspective*, 52 Law & Cont. Problems 311, 317 n. 34 (1989) ("Although the [mock] juries in the unitary trials considered each trial decision in sequence, evidence on matters not directly related to the causation issue intruded on the decisionmaking process. At each decision point, the unitary juries looked for other evidence, especially evidence concerning damages, to buttress their decisions. This phenomenon was most evident when juries were faced with the most ambiguous trial issue, general causation.").[38] *But see Bendectin Litig.*, 857 F.2d at 316 (indicating that the trial judge should take measures to ensure "that the jury [does not] ... decide the causation question without appreciating the scope of the injury that defendant supposedly caused and without the realization that their duties involve the resolution of an important, lively and human controversy"). Because the inquiry is of such a technical nature, individual claimant participation is superfluous.[39]

Even if consolidation did not substantially streamline presentation of the claimants' cases, it is obvious that it would greatly simplify the Debtor's task in comparison to what would be required were each case to be individually tried. Rather than making the same arguments and producing the same evidence *ad infinitum*, the Debtor could channel all of its energy into a single forum in arguing—once and only once—that silicone is safe.[40] Thus we are convinced that

37. Based on the recent experiences in the silicone-gel breast implant litigation, it is no surprise why plaintiffs wish to put their suffering before juries and why the defendants prefer bifurcation. For example, in a celebrated trial in Texas in 1994, a jury awarded a verdict of $5.2 million for Gladys Laas against Dow Corning. In a television documentary, in which two jurors (Jose Ramirez and Judy Sorensen Nauman) were interviewed, the jurors stated that the jury was not satisfied that silicone had caused the plaintiffs' disease. When the narrator asked why then the jury awarded her so much money, the jurors explained that Ms. Laas and her husband had suffered quite a lot and needed the money. *Frontline: Breast Implants on Trial* (Corporation for Public Broadcasting broadcast February 27, 1996).

38. Taking this argument to its extreme reveals its weakness.

It is an unshakable credo of plaintiffs' personal injury lawyers that bifurcation (of liability and damages) is anathema. Jurors are people of flesh and blood who more readily can reach a just result if they hear riveting testimony and see gripping evidence of how flesh was torn and blood was spilled. That belief is a corollary of the golden rule argument (technically prohibited in closing, but likely used throughout the trial), which asks the jurors: "put yourself in the place of the plaintiff. How would you want yourself to be treated?" ... [The jury's tendency to compensate for weak evidence of causation with strong evidence regarding other elements of the plaintiffs' case represents] the centuries-old tradition of permitting the jury to consider all facts and to reach verdicts that are deemed proper under all the circumstances: "the jury's opportunity to humanize its verdict." *The jury was not designed solely to resolve issues of fact on a* rational basis. The jury is "nurtured as an institution for deciding legal disputes in a way that litigants and the community find acceptable," in effect a "community consensus."
Robert E.L. Bonaparte, *Bifurcation: Opposing Views*, The Policyholder's Perspective, 4 No. 1 Coverage 23, 23–24 (Jan./Feb.1994) (footnotes omitted; emphasis added) (The points expressed were purposely sharpened for a debate and were not necessarily those of the author). This remarkable passage suggests that, when the argument is taken to its logical limits, attorneys are opposing bifurcation in personal injury cases *precisely because* bifurcation increases the likelihood that the jury will carefully examine the question of causation.

39. This is not to suggest that the implant claimants' medical histories are irrelevant. To the contrary, a pattern of complaints relating to silicone exposure is itself some indication—though its probative force is subject to dispute—that the substance is harmful. To be accorded evidentiary weight, however, the claimants' case histories would have to be presented in some kind of cumulative fashion, so that a statistically significant trend can plausibly be said to emerge. *See Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 312 (5th Cir.1989) (stating that causation cannot properly be inferred from an epidemiological study if "the confidence interval ... renders the study statistically insignificant"), *modified on other grounds*, 884 F.2d 166 (5th Cir.1989) (per curiam). In fact, the implant claimants' need for this kind of data serves as an additional incentive to devise a common trial strategy in attempting to prove that silicone is harmful.

40. Or a handful of times if the plaintiffs' group is divided into manageable subclasses, and also subject to our suggestion in Part V.E., *infra* pp. 591–593 that this provision be repeated.

consolidation/separation under Rule 42 would, at a minimum, substantially reduce the burden on both the Debtor and the judicial system. *See Wilson,* 107 F.R.D. at 252 ("[T]he Court's consolidation will save these defendants the expense of litigating the [common] issues of product defectiveness and punitive damages in 50 separate trials."); *In re Joint Eastern and Southern Dists. Asbestos Litig.,* 1990 WL 4772 at *3 ("Consolidation ... produces significant time-savings and conserves litigation costs simply because common evidence such as general scientific evidence concerning exposure time or general medical evidence regarding asbestos-related diseases and causation 'can be presented once rather than six to eight times in individual trials.'" (citations omitted)); *cf. School Dist. v. Lake Asbestos of Quebec, Ltd. (In re School Asbestos Litig.),* 789 F.2d 996, 1008 (3d Cir.1986) ("Determination of the liability issues in one [class action] suit may represent a substantial savings in time and resources. Even if the action thereafter degenerates into a series of individual trials on damages,[41] the result nevertheless works an improvement over the situation in which the same separate suits require adjudication on liability using the same evidence over and over again.").

And finally on the question of justice, it is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness, wins a multimillion dollar verdict against a defendant while another takes nothing. Sherman, 10 Rev.Litig. at 243 ("It is a fundamental principle of justice that like cases should be accorded like treatment in the interests of achieving consistent results."); *cf.* Mark J. Roe, *Bankruptcy and Mass Tort,* 84 Colum.L.Rev. 846, 877–78 (1984) ("[T]he norm of accurate compensation is much more significant in tort reorganizations than in financial reorganizations; indeed, it may be central ... [because] the individual tort claimant ... is far less able to bear [the risk of a disparate outcome]."). That has been the history so far of breast implant litigation, and it highlights the roll-of-the-dice nature of civil litigation involving

scientific questions which have not been adequately researched.

■ A couple of final observations regarding consolidation are in order. While Rule 42 cautions against violation of the constitutional right to a jury trial, nothing precludes a court from impaneling a jury for each of the separate trials in a bifurcated case or group of cases. *See* 9 Wright & Miller, *Federal Practice and Procedure: Civil* 2d § 2391 (1996). And although the Sixth Circuit seemed to express reservations on the matter, *see Moss v. Associated Transport, Inc.,* 344 F.2d 23, 25 (6th Cir. 1965) (dictum), it has since opined that the Constitution does not require that all facts be decided by the *same* jury. *See Bendectin Litigation,* 857 F.2d at 315 ("[T]here is no constitutional prohibition against trying these issues before different juries."). Others have reached the same conclusion. *See In re Breast Implant Cases,* 942 F.Supp. 958, 962 (E. & S.D.N.Y.1996) (collecting cases); *see also* 9 Wright & Miller, *Federal Practice and Procedure: Civil* 2d § 2391 n. 6 (collecting cases).

■ This does not mean, of course, that the second jury can run roughshod over the findings of the first. *See, e.g., Castano v. American Tobacco Co.,* 84 F.3d 734, 750–51 (5th Cir.1996) ("There is a risk that ... the second jury could reevaluate the defendant's fault.... In such a situation, the second jury would be impermissibly reconsidering the findings of a first jury."). The Seventh Amendment states that "no fact tried to jury shall be otherwise re-examined in any Court of the United States...." The Seventh Amendment would be a concern if the specific causation/damages jury revisited the issue of general causation in its deliberations. That could happen if, after the general causation jury found that silicone-gel CAN cause disease, the Debtor were permitted in the second trial to argue that breast implants cause disease so rarely that it is highly unlikely that the plaintiffs' disease was caused by the implants. In support of this argument, the Debtor could be expected to seek to introduce all the science presented at the

---

41. Even here aggregation methods are available. *See* Part V.G., *infra* pp. 594–597.

first trial. If the Court were to allow this type of argument and the evidence which supports it, the Seventh Amendment argument would have merit.

However, experienced trial judges in conjunction with the parties and the panel of experts could overcome this pitfall through careful controls over the trial processes. For example, the general causation jury could be required to give an up-or-down verdict on the possibility of silicone gel causing the disease(s) in question. The jury could then be asked a series of follow-up questions if the verdict is affirmative. The jury could be asked to quantify the risk in the form of a ratio or a percentage; that is, in a hypothetical universe with 100,000 women, if disease X would occur naturally in four women, but the statistics show that six in every 100,000 women with breast implants have a likelihood of contracting the disease, the chance that a particular breast implant claimant contracted the disease because of the implants as opposed to natural causes would be reduced to a figure of one in three (2 out of 6). The judge presiding over the specific causation/damages trial could open the proceedings by explaining to the jury that a prior jury had determined that silicone-gel breast implants can indeed cause disease in some numbers of persons and that it is the plaintiff's job to show that in her case, the disease, which also occurs in two out of three cases naturally, was caused by the implants.

The Debtor would be permitted to introduce contrary evidence limited to the specifics of the plaintiff's circumstances. For example, the Debtor would be permitted to show that the plaintiff exhibited early symptoms of the disease even before she received the implants, that there is a history of the disease in her family, that she had the implants too short a period of time for symptoms to have been caused by the implants, etc.

By methods such as these (or others developed by skillful jurists with the assistance of counsel and other experts), the danger of

allowing a second jury to re-examine the findings of a first jury can be greatly minimized.[42]

■ For these reasons, actual liquidation via consolidation and bifurcation would prove to be the preferred option in this case if the case is not resolved consensually.

## D. The General Causation Trial and the Panel of Experts

There can be no doubt that a hearing to determine the admissibility of the testimony of the claimants' proffered expert witnesses would be requested by the Debtor since it (and the U/S CC) has continually referenced the necessity of such a hearing throughout these proceedings.

The admissibility of expert scientific testimony is governed by F.R.E. 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." When confronted with a proffer of expert scientific testimony, the trial court has a gatekeeping function to perform pursuant to F.R.E. 104(a) which provides that "[p]reliminary questions concerning the . . . admissibility of evidence shall be determined by the court. . . ."

■ In performing this gatekeeping function "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795; *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir.) *cert. denied*, —— U.S. ——, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997). This determination requires that the court engage in a two-part inquiry. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796; *Smelser v. Norfolk Southern Ry.*, 105 F.3d 299, 303 (6th Cir. 1997). First, the court must determine "whether the expert is proposing to testify to . . . scientific knowledge . . . .' "—the reliabil-

---

42. Moreover, it is by no means certain that allowing the second jury to determine that the association between silicone gel and a specific disease is weak with respect to a particular plaintiff is necessarily a nullification of the first jury's verdict—that there is some association between the two.

ity component. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796; *Smelser*, 105 F.3d at 303. Second, the court must determine whether the proffered testimony "will assist the trier of fact to understand or determine a fact in issue"—the relevancy component. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796; *Smelser*, 105 F.3d at 303.

■ Proffered scientific testimony is relevant if the "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796; *Smelser*, 105 F.3d at 303 ("[T]he court 'must ensure that the proposed expert testimony is relevant to the task at hand.' ") (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995) (on remand), *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)); 4 *Weinstein's Federal Evidence*, § 702.05[2], at 702–30 (2d ed.1997) (stating that relevancy requires "a valid scientific connection to the pertinent inquiry").

■ The reliability component of the inquiry requires an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid...." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796. In *Daubert*, the Court set forth a non-exclusive list of factors that the trial judge should consider when making this assessment: (1) "whether a theory or technique ... can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication," (3) consideration of "the known or potential rate of error" associated with "a particular scientific technique" as well as "the existence and maintenance of standards controlling the technique's operation;" and (4) whether the scientific theory or technique espoused has gained "general acceptance" in the scientific field of relevance. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97; *Jones*, 107 F.3d at 1156; *Smelser*, 105 F.3d at 303. Some circuits, including the Sixth, have added a fifth factor: " 'whether the experts are proposing to testify about matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying' because the former 'provides important, objective proof that the re-

search comports with the dictates of good science.' " *Smelser*, 105 F.3d at 303 (quoting *Daubert*, 43 F.3d at 1316 (on remand)).

In addition, when a court is making a Rule 702 admissibility determination, it "should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797. For example, "expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' " *Id.* (quoting F.R.E. 703). Furthermore, "Rule 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....' " *Id.* (quoting F.R.E. 403). Finally, pursuant to F.R.E. 706, a court generally has discretion "to procure the assistance of an expert of its own choosing." *Id.*

Unquestionably, in performing a *Daubert* inquiry, the trial court would be greatly assisted by impaneling a group of experts. Panels of experts have already been named in at least three other cases involving silicone-gel breast implants. *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL 926, October 31, 1996 Order No. 31E; *Hall v. Baxter Healthcare*, 947 F.Supp. at 1392–93; *Breast Implant Cases*, 942 F.Supp. 958.

■ Unfortunately, as Judge Weinstein correctly noted, under F.R.Bankr.P. 9031, a court is not permitted to appoint masters under the Bankruptcy Code. F.R.Bankr.P. 9031; Weinstein, *Individual Justice* at 245 n. 63. Whether the experts which the Debtor requested us to appoint to assist us in estimation would be "masters" is not entirely clear. According to 9 *Moore's Federal Practice*, § 53.05[1] (Matthew Bender 3d ed.1997), a master "is an individual who is appointed by the court to assist in performing specific functions in a pending action." The experts appointed in previous mass torts cases were designated as "masters." *See* 9 *Moore's Federal Practice* at § 53.41. Under this broad definition, the panel of experts the Debtor requested us to appoint would clearly be masters. On the other hand, the Court has

the power to appoint its own expert witness under F.R.E. 706. Whether the panel of experts which the Debtor requested this Court to appoint would therefore be masters, forbidden by F.R.Bankr.P. 9031, or expert witnesses under F.R.E. 706 is of no further significance since this Court will not be conducting such an estimation hearing. Moreover, it is likely that a district judge would appoint one or more masters under F.R.Civ.P. 53.[43] Therefore, the Debtor's motion for this Court to appoint such a panel will be denied.

That is not to say that a panel of experts is not necessary. We fully agree with the Debtor that the trial court would be greatly assisted by such experts, and would therefore recommend that the district court judge who presides over the general causation trial appoint such a panel.

As noted above, the role of the panel of experts is ambiguous. The Court recognizes several areas in which scientific expertise would be of assistance. The panel of experts proposed by the Debtor need not be limited to researching, contemplating, reporting on, or testifying with respect to the scientific evidence in a *Daubert* hearing. Assuming the *Daubert* hearing results in a favorable ruling for the claimants, such experts might be called by the trial court to testify at the trial.

Early in this case, the TCC's attorneys argued that no single trial could, without confusing the jury, deal with more than one of the many diseases which the TCC says the Debtor's silicone gel causes. A panel of experts could tell the judge whether this assertion is correct. Perhaps diseases A–D could be handled in one general causation trial and diseases E–G considered in another. A trial court could certainly use expert assistance in making this decision. Such a panel might also include law professors who have expertise in crafting appropriate mass tort trials.

They might be able to assist the trial court in deciding, among other things, whether the proof standards for product liability differ from state to state and if so which states' claimants can be joined into a single trial.

It is also a matter of dispute whether a rupture of or leakage from a silicone-gel breast implant is a seriously threatening phenomenon. The Debtor's view is that if silicone gel is bio-inert it should be of no major health concern to the implantee that the envelope is cracked or porous. (That is not to say that she would not have legitimate cosmetic damages or perhaps some incidental local discomfort.) Of course, the TCC has a diametrically opposing view. To simplify matters for the general causation jury, and with the corroborative advice of the panel of experts, it is recommended that the trial be limited solely to the biological effects of free-floating silicone gel in the human body. That means, of course, that evidence about the alleged weaknesses of the elastomer envelope would be excluded; the jury would be instructed to assume that silicone gel escaped from the envelope in some (or even all) cases given a sufficient length of time.

### E. Timing and Content of the General Causation Trial

■ In our opinion, the Debtor prefers a single general causation trial now or as soon as possible because it perceives that the results of scientific studies strongly support its view that silicone gel is nontoxic. With that as the sole issue for trial, it calculates its chances for a salutary result as quite high. The tort claimants would prefer to introduce evidence of their own suffering, the better to influence the juries' sympathies for their plight in order to compensate for the weakness in their cases on liability. *See supra* notes 37–38 and accompanying text. The claimants can legitimately also argue that scientific studies are ongoing[44] and that a single trial on causation magnifies the risk of

---

**43.** Query: If the district judge is hearing the matter originally, is she also restricted by F.R.Bankr.P. 9031 since the rule does not disqualify bankruptcy judges from appointing masters; instead, it says that "Rule 53 F.R.Civ.P. does not apply in cases under the Code."

**44.** For example, as the TCC has previously noted, then F.D.A. Commissioner, Dr. David Kessler, and others have asserted that further research is needed in this area. *See* Barbara G. Silverman et al., *Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review* 124 Annals of Internal Medicine 744, 746 (1996).

an erroneous factual determination. Science is, after all, evolutionary; its conclusions are not fixed. What is scientific truth today is subject to change based upon further evidence.

Though meritorious, this argument does not overcome the strong case for a consolidated general causation trial. Instead, it tends to support the idea that this trial be conducted in stages separated by years, to allow for the state of scientific knowledge on this topic to advance. *See, e.g. Amchem Products,* —— U.S. at ——, 117 S.Ct. at 2243 (tort claimants without present symptoms "would ... seek ... 'causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993.'" (quoting from *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 630 (3d Cir.1996))). For example, tort claimants might be offered the choice of going to a consolidated general causation trial to be conducted now, or in another such trial to be held some number of years from now. Each claimant could then, with the assistance of counsel and others, evaluate her chances of success today and in the future on the issue of liability. At the same time, the claimant may evaluate the progression of her symptoms. If her symptoms are currently insubstantial, having her claim decided now might be unpalatable. As a result, she might choose to wait for a future trial, hoping that new studies would better support her case on liability and that if her symptoms worsen it would better support her case on damages. On the other hand, a claimant whose symptoms and need for a current recovery are severe might elect to take her chances on liability based on today's scientific evidence. The unfairness to the claimants of the Debtor's single trial proposal can thus be significantly ameliorated.

Critics could certainly argue that it is inappropriate to delay trial merely to allow science to develop. Many cases would seem to support this position. In *Daubert*, the Supreme Court instructed:

Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

509 U.S. at 597, 113 S.Ct. at 2798–99. *See also Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 315 (5th Cir.) (holding that lack of epidemiology supporting plaintiffs' causation theory was fatal to their case notwithstanding possibility "that new and conclusive studies [may] emerge which would give a jury a firmer basis on which to determine the issue of causation"), *modified on other grounds,* 884 F.2d 166 (5th Cir.1989) (per curiam), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Turpin v. Merrell Dow Pharm., Inc.*, 736 F.Supp. 737, 744 (E.D.Ky. 1990) ("until new and conclusive medical and epidemiological studies emerge which give a jury a firmer basis on which to determine the issue of causation, courts must rely on the current data that no statistically significant association between Bendectin and human birth defects exists"), *aff'd,* 959 F.2d 1349 (6th Cir.1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1223, 1259 (E.D.N.Y.1985) ("Courts cannot wait forever. They must decide now."), *aff'd,* 818 F.2d 187 (2d Cir.1987); *In re TMI Litigation Cases Consolidated II*, 911 F.Supp. 775 (M.D.Pa. 1996) (refused to prolong the action until the plaintiff could develop further facts and evidence to support the claim); *Mastalski v. International Business Machines Corp.*, No. 92–1016, 1992 WL 207789 (4th Cir. Aug. 28, 1992) (lower court properly refused to await further developments in science to support plaintiff's claims before ruling on the defendant's motion for summary judgment). *But*

*see Breast Implant Cases*, 942 F.Supp. at 961 (declining to grant defendants summary judgment even though at present the plaintiffs' lack sufficient scientific evidence to make a case because the scientists are still studying the issue and might uncover evidence helpful to the plaintiffs).

Those cases arose in an entirely different context. In none of them were plaintiffs forced to go to trial in a case that they themselves did not institute. Here there would be thousands of claimants forced to try a case when they have never experienced any problem with the product. Outside of bankruptcy they could not have been forced to do so. In fact, had they wanted to sue Dow Corning, their cases would undoubtedly have been dismissed since they would not be able to show injury. *Cf. Metro–North Commuter Ry. v. Buckley*, —— U.S. ——, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). Dow Corning, of course, wants relief from the thousands of pending lawsuits which it said drove it into bankruptcy. But, in addition, it is seeking the extraordinary relief of forcing people to sue now even though they have nothing yet to complain about, upon threat of losing the right to do so even if injury occurs in the future. Consequently, the cases cited above are not good authority for this unique situation.[45]

■ However, it is not unfair to require a claimant who has in any manner (such as in a proof of claim or a lawsuit) alleged that she presently suffers from disease symptoms which she associates with her implants, to prove her claim now. Therefore, only claimants who do not presently assert that they suffer from disease symptoms on account of their implants ought to be permitted to avoid participation in, and the results of, the early general causation trial.

If it becomes clear to this Court that hope for a consensual plan is lost and liquidation of claims through litigation becomes necessary, we will recommend that the District Court schedule staggered consolidated general causation trials. A claimant permitted a choice of trials in which to participate who does not opt into the first causation trial will be included—without ability to opt out—in a latter one if her claim is not previously settled.[46]

### F. Additional Parties to the General Causation Trial

■ The Court of Appeals has ruled that the personal injury claims against the Debtor's shareholders and companies that purchased silicone gel from the Debtor for use in their own breast implants are within the jurisdiction of the District Court for this district. *Lindsey v. O'Brien, Tanski*, 86 F.3d 482. If silicone is non-toxic when placed in the Debtor's elastomer envelope, it is just as non-toxic when placed in 3M's or Baxter's or Bristol–Myer–Squibb's elastomer envelope (and vice versa). So it makes sense that the jury's factual determination on this issue would cut across company boundaries. However, if the other manufacturers are not parties to the litigation which makes this decision, it is doubtful that they would either be bound by a verdict of product liability or could use a verdict of product innocence in any subsequent trial directed solely against them. Therefore, the District Court might justifiably include the other manufacturers in the single (or multiple) general causation trial(s). The same, of course, is true for the Debtor's shareholders.

If the other manufacturers participate in and prevail at the general causation trial, all cases pending against them that were brought by persons who also filed claims

---

**45.** Moreover, defendants cannot be heard to complain if the court, in managing its own docket, decides to break up a trial into two parts, each having thousands of plaintiffs. Each action would be final as to those participants. No participant would be entitled to a retrial based on further scientific evidence.

**46.** A somewhat similar suggestion was offered by Professor Rosenberg in *The Causal Connection in Mass Exposure Cases: A 'Public Law' Vision of the Tort System*, 97 Harv.L.Rev. 849, 924 (1984)

("Because the passage of time may also uncover new information relevant to the issue of liability, courts should not consider final the initial determination of excess risk on which the [retroactive insurance] fund is based. When new evidence bearing on the extent of the excess risk comes to light, the court should reopen its judgment, update its estimate of risk, and adjust the defendant's premium or annuity obligation upward or downward accordingly.").

against this estate and who submitted to the trial would be subject to dismissal. This is because those plaintiffs would be estopped to assert that the silicone gel in those manufacturers' implants was harmful. On the other hand, if silicone gel is found to potentially cause implantees physical harm, then participating manufacturers would be estopped to deny this fact in actions pending elsewhere against them by persons who participated in the general causation trial.[47]

## G. Specific Causation and Damages

We all know what the result would be if the general causation trial establishes that silicone gel is non-toxic. But what happens if the jury concludes otherwise? Under the latter scenario, the general causation trial would only solve part of the liability equation, for the issues of specific causation and damages would still remain unaddressed. *See supra* note 35.

The determination of both specific causation and damages hinges upon factors that are more individual in nature. Unquestionably, this fact makes the use of an aggregative procedure to resolve these claims more difficult. However, due to the overwhelming number of claims, trying each individual claim one at a time is not feasible. If there is any hope of adjudicating the claims in a fair, efficient and timely manner, some type of aggregative approach is still mandated. Because of this fact, the TCC's proposal to conduct numerous trials, the results of which would then be extrapolated to the population of claimants as a whole, becomes worthy of strong consideration. What the TCC proposes is sampling. As succinctly described by one commentator, sampling

> uses statistical methods to adjudicate a large population of similarly situated cases. Rather than decide each individual case separately, the court aggregates all the cases and selects a random sample. The court then adjudicates each sample case and statistically combines the sample outcomes to yield results for all cases in the larger population.

Bone, 46 Vand.L.Rev. at 563.

Much has been written on the benefits of sampling in mass tort cases.[48] However, two articles on the subject which the Court found to be particularly enlightening are Bone's *Statistical Adjudication* and Saks' & Blanck's *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts.* Both of these articles favorably discuss the results and methodology used by Judge Robert M. Parker in *Cimino,* 751 F.Supp. 649.[49]

In *Cimino,* Judge Parker was confronted with the daunting task of adjudicating 2,298 hotly contested asbestos lawsuits. A seasoned veteran of the long enduring asbestos saga, Judge Parker began his opinion by lamenting the failures of previous attempts to fairly deal with the huge crush of asbestos cases and the certain consequences of stubbornly clinging to traditional methods of adjudicating tort claims:

> If the Court could somehow close thirty cases a month, it would take six and one-half years to try these cases and there would be pending over 5,000 untouched

---

47. That is not to say, however, that such plaintiffs would be absolved of the burden of proving specific causation. *See supra* 35.

48. *See, e.g.,* Bone, 46 Vand.L.Rev. 561; Saks & Blanck, 44 Stan.L.Rev. 815; Glen O. Robinson and Kenneth S. Abraham, *Collective Justice in Tort Law,* 78 Va.L.Rev. 1481 (1992); Rosenberg, 97 Harv.L.Rev. 907 n. 221 & 911 n. 236. Additionally, a few courts have successfully implemented this procedure. *See, e.g., Adams v. Shell Oil Co. (In re Shell Oil Refinery),* 136 F.R.D. 588 (E.D.La.1991), *aff'd sub. nom., Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir.1992) (oil refinery explosion); *Cimino,* 751 F.Supp. 649 (asbestos).

49. Other commentators have also written approvingly of the methods employed in *Cimino. See* Coffee, 95 Colum.L.Rev. at 1385 (observing that of the various aggregative experiments employed by the courts that were confronted with overwhelming asbestos litigation "[t]he most innovative and successful experiment was that employed by Judge Robert Parker...."); Hensler & Peterson, 59 Brook.L.Rev. at 1053–54 (concluding that the *Cimino* method "increases the likelihood that settlement amounts will mirror actual losses, and decreases the likelihood that the value of serious claims will be diluted by the existence of a large volume of minor injury claims").

cases at the present rate of filing. Transaction costs would be astronomical.

The great challenge presented to the Court by this litigation is to provide a fair and cost effective means of trying large numbers of asbestos cases. It is not enough to chronicle the existence of this problem and to lament congressional inaction. The litigants and the public rightfully expect the courts to be problem solvers. *Cimino*, 751 F.Supp. at 652. The final line of the opinion is even more forthright: "[W]ithout the ability to determine damages in the aggregate, the Court cannot try these cases." *Id.* at 667.

Judge Parker began by certifying the 2,298 cases as a class action.[50] *Id.* at 652. He then divided the trial into three phases. Phase I was used to "resolve all common [liability] issues."[51] *Id.* at 653. When the jury returned a verdict in favor of the plaintiffs, the trial moved to Phase II, which was "designed to resolve the issue of the plaintiffs' exposure to the defendants' products on a class wide basis." *Id.* at 653–54. The second phase is of no relevance to the present case. The innovative aspect of the *Cimino* procedure which is the focus of this section came in Phase III.

In Phase III, Judge Parker used stratified sampling to determine the damages of the individual plaintiffs. First, he divided the 2,298 plaintiffs into "five disease categories based on the plaintiffs' injury claims." *Id.* at 653. Then he selected a random sample from each disease category for a total of 160 sample cases. *Id.* Next, two new juries were selected. The two juries sat together during the presentation of general medical testimony. *Id.* Subsequently, the juries were divided to hear testimony on groups of plaintiffs and to return damage verdicts. *Id.* The sample verdicts were combined in order to arrive at the total damage award for the overall population of cases. Each sample case plaintiff received his/her actual trial verdict. The remaining plaintiffs received the average of the total sample verdicts for their disease category.

We recognize that Phase III of *Cimino* utilized sampling solely for the purpose of determining damages. And some concern has been expressed that *Cimino*-type sampling can only be used for this purpose—that is, only after tort claimants have succeeded in proving both general and specific causation. The basis for this assertion is that neither general nor specific causation are amenable to probabilistic analysis. The Court disagrees with this viewpoint. Unquestionably, a sampling procedure that determines both specific causation and damages would be more difficult to design. However, it does not present an insurmountable problem. We will discuss in more detail below ways in which this can be done.

A critic would likely argue that sampling involves the potential sacrifice of at least some outcome accuracy. Bone, 46 Vand. L.Rev. at 568. However, this point is debatable. *See* Saks and Blanck, 44 Stan.L.Rev. at 839 ("The illusion that individualized adjudication provides a precision that aggregation lacks is nothing more than that, an illusion. Individualized trials substitute one form of error for another. Therefore, the results actually may be less accurate than a well-conducted aggregated trial."). Society already places considerable confidence in the ability of statistical methodologies to produce accurate results. For example, statistics are readily used in the areas of medical research, new product testing, marketing, insurance, education and politics. *Cimino*, 751 F.Supp. at 660–61. And the "[a]cceptance of statistical evidence is now commonplace in the Courts." *Id.* at 661. This is the case even in the area of tort law where statistics are used to prove both liability and damages. *Id.* at 662. Society's pervasive use of statistics to provide answers to hard-to-quantify problems undeniably demonstrates the fact that

**50.** Actually the class originally consisted of 3,031 plaintiffs. *Cimino*, 751 F.Supp. at 652. However, 733 of these cases were removed as a result of being dismissed, severed or settled. *Id.*

**51.** Phase I of the *Cimino* trial was essentially the same as the general causation trial that the Court has recommended. The Court notes that Phase I of *Cimino* proceeded as a class action. Conversely, this Court recommends aggregating the pending cases through a Rule 42 consolidation. However, this factor should not make implementation of Judge Parker's procedure more difficult.

such methodologies can be employed to produce outcomes of acceptable accuracy. The accuracy of results can be heightened by ensuring that subgroups are as homogenous as possible and through the use of linear regression. Bone, 46 Vand.L.Rev. at 579 and 617. Linear regression, as opposed to averaging, can incorporate variables specific to each plaintiff—age, medical history, future lost income, etc.—into the specific causation and damage equation. *Id.* at 585.

Due process concerns may be raised over the fact that not all plaintiffs receive their own day in court in connection with specific causation and damage determination. Bone, 46 Vand.L.Rev. at 566–67 n. 16. However, these concerns are largely illusory and need not be a deterrent to the use of sampling in this case. *See* Bone, 46 Vand.L.Rev. at 617 (concluding that when implemented properly, "it is difficult to see how the use of sampling can run afoul of procedural rights"); Saks and Blanck, 44 Stan.L.Rev. at 815 (discussing how when a mass tort is involved, "Aggregation [including sampling] adds an important layer of process which, when done well, can produce more precise and reliable outcomes" than the "traditional bilateral trial"); *see also Cimino*, 751 F.Supp. at 665–67. In fact, Saks and Blanck were even more emphatic on this point when they stated that "the absence of . . . [aggregative] procedures is tantamount to denying many litigants their due process trial rights altogether." Saks and Blanck, 44 Stan.L.Rev. at 826.

Sampling can be used in a way that guarantees the procedural and substantive rights due to all parties involved. This is particularly true in bankruptcy. Section 502(c) provides that *any* unliquidated claim can be estimated for purposes of allowance. Personal injury and wrongful death claims are not excluded from this section. 28 U.S.C. § 157(b)(2) places a limitation on the broad grant of authority found in § 502(c) by making clear that a bankruptcy judge does not have the authority to estimate such claims for ultimate distribution purposes. However, this limitation only applies to bankruptcy judges. Consequently, a district court judge arguably does have the power to do so.

We concede that there is tension between the notion that a district judge can estimate a personal injury claim for purpose of allowance, which is suggested by § 157(b)(2)(B), and the notion that a district judge "shall order that personal injury . . . claims shall be tried . . .," suggested by § 157(b)(5). A more important restriction on a proposal that a district judge estimate such claims for purposes of allowance and ultimate distribution is § 1411, which provides that "title 11 do[es] not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury . . . claim." The combination of §§ 157(b)(5) and 1411(a) supports the view that no individual personal injury claimant can be forced to forego a jury trial of her claim. But here it is the representative of personal injury claimants who champions sampling methodology. Thus, it is highly probable that most claimants will accept sampling as an expedient means to just compensation.

While the Debtor has not yet found sampling palatable, it might ultimately accept it if it were properly designed. We note that the Debtor's fiercest criticism of the TCC's proposal is focused on the methodology employed, as opposed to the concept of extrapolating from a data base of prior litigation results.

Moreover, even if the Debtor persisted in opposing sampling in any form, this may not prevent the trial court from nevertheless proceeding in that manner. While it is true that bankruptcy cannot affect the right of an "individual" to a jury trial "with regard to a personal injury or wrongful death claim." 28 U.S.C. § 1411(a), this section only protects an individual's right to a jury trial, not that of a corporation. *See* 11 U.S.C. § 101(41) ("person" includes individual, partnership, and corporation . . .). The Debtor here, a corporation, may very well not be entitled to insist upon a jury trial if the claimant waives one. And §§ 157(b)(2) and (5) and 1411(a) were enacted in 1984 as part of a unified plan to protect personal injury claimants' rights from alleged mistreatment in bankruptcy. In the absence of that special-interest legislation, the rule was (and with respect to all other types of claims still is) that neither the

claimant nor the debtor is entitled to a jury trial to liquidate or to estimate a claim.

Therefore, it would seem that if tort claimants are willing to have the specific causation and damages portion of their claims determined through a sampling procedure, no procedural obstacle prevents this from being done. For what it's worth, the claimant and the District Court could simply call the procedure a § 502(c) estimation and proceed to estimate—i.e., for all intents and purposes liquidate—the claim through extrapolation from other litigation results.

Moreover, this case must proceed with an eye on reality. The only alternative to sampling, some form of individualized damage determination, is simply not realistic. Judge Parker, an experienced trial judge, emphatically noted the impossibility of individually trying 2,298 asbestos cases. How then, could the approximately half million breast implant claims pending before the Court be tried in a manner that makes their adjudication fair and meaningful? As Professor Francis McGovern has aptly pointed out, "the adage, 'justice delayed is justice denied' stills rings true." McGovern, 69 B.U.L.Rev. at 689.

The parties would have the primary responsibility of developing a sampling protocol sophisticated enough to determine both specific causation and damages. Most likely the assistance of experts would be required in this endeavor. With that in mind, the Court makes the following suggestions that could serve as a starting point for the parties.

If liability is found at the general causation stage, the sampling process could begin with the development of a detailed informational questionnaire that each claimant would be required to complete. The completed questionnaires would be used to divide the tort claimants into appropriate subgroups. Next, a random sample of tort claimants would be chosen from each subgroup. The number chosen would have to be sufficient to create statistically relevant results that could then be extrapolated to the rest of the members of the subgroup.

Each of the randomly selected tort claimants would then receive a jury trial. Based on the jury findings, linear regression equations would be developed. If the process is determined to be an estimation, the juries could even be asked to decide questions not specific to the individual plaintiffs before them. For example, the plaintiff may be 36 years old. However, the jury could be asked to decide how their determination would have been affected if the plaintiff had been 44 years old, etc. By doing this, more detailed linear regression formulas could be developed that take account of a larger number of factors bearing upon both specific causation and damages. This, in turn, could lead to a greater accuracy in the results extrapolated to each tort claimant.

Some form of payment grid could be considered as an alternative. Though it seems to us that a payment grid could be more static and inflexible in that it might not address factors specific to an individual tort claimant as easily or as accurately as a linear regression formula, statistical and other experts might see it differently. Either way, aggregative methods of determining specific causation and damages will be essential if ever there is to be an end to litigation.[52]

## H. Non-disease Breast Implant and Other Personal Injury Claims

So far, this opinion has focused most intensely on breast implantees' claims involving allegations of systemic illness. Putting to one side the numerous other claims dealing with non-gel silicone medical products, the other large class of personal injury claims involves nondisease breast implant claims, such as disfigurement and discomfort, arising from implant rupture or leakage. The TCC placed heavy emphasis on these claims. Dow Corning has historically settled such claims and has expressed willingness to continue to do so. In short, although it

---

**52.** Because of the annoying §§ 157(b)(5) and 1411(a), there appears to be no way to deprive an insistent personal injury claimant from her very own jury trial on specific causation and damages. But a court can manage its docket to achieve justice first for the mass of claimants, putting individual claims to the end of the line. Such not-so-subtle pressure has been part of many mass tort bankruptcy cases.

continues to vociferously deny that its product causes illness, the Debtor does not seriously contest liability for such things as product failure. For this reason, it makes sense not to hold up liquidation of the nondisease claims until the Debtor's liability to a different class of claimants for a different type of injury is determined. Judges Weinstein and Baer in New York recently came to a similar conclusion, *In re Breast Implant Cases,* 942 F.Supp. at 962–63, as did Judge Jones in Oregon, *Hall v. Baxter Healthcare,* 947 F.Supp. at 1414 ("In light of these rulings [granting the defendants' motion per *Daubert* to exclude evidence offered by the plaintiffs to establish that silicone gel causes diseases], the court will sever plaintiffs' local injury claims [such as from rupture, contracture, and chest wall pain] from their claims for . . . any systemic illness or injury.").

Therefore, if the parties are unable to soon reach a consensus on the terms of a plan of reorganization, thus triggering the litigation method of claims allowance, we recommend that nondisease-only breast implant claims (including those of women and their families who agree not to press fear-of-future-disease damages) and personal injury claims arising from products other than breast implants proceed through the allowance process as soon as possible.[53]

## VI. Distribution Models Which Need Improvement

### A. Fundamental Principles of Bankruptcy Distribution

The Bankruptcy Code establishes a priority scheme in which certain classes of claims are paid ahead of others. In a cramdown plan, until all claims in a particular class are fully compensated, no junior classes are entitled to receive distribution from assets of the bankruptcy estate. If funds are insufficient to fully compensate a particular class of claims, those claims share in the available funds *pro rata.* *See* 11 U.S.C. §§ 507, 726; Roe, 84 Colum.L.Rev. at 850 (discussing the two core bankruptcy principles of absolute priority and temporal equality; the latter concept rejects the notion of first-come, first served.).

Commercial claims and tort claims both fall into the category of general unsecured claims. Consequently, unless otherwise agreed among the affected classes,[54] if the funds available to compensate these claims are not sufficient, they must be divided among commercial claims and tort claims on a *pro rata* basis. *See, e.g.,* Roe, 84 Colum.L.Rev. at 887.

A *pro rata* division of funds among a particular class of creditors usually involves the application of a simple mathematical equation. The value of assets available for disbursement constitutes the numerator, and the amount of claims entitled to be paid constitutes the denominator. However, when there are substantial unliquidated tort claims the process is complicated. And when a substantial portion of these claims are of the "future claim" variety, the process becomes even more complex.[55]

---

53. If, as the TCC contends, the Debtor ultimately proves to be insolvent, it would be unfair to pay other classes of personal injury claimants in full while the breast implant disease claims wend their way through a lengthier allowance process, since there may be no money left by the time these claims are allowed. Therefore, if the parties are unable to achieve a consensual plan to otherwise deal with all of the claims, a system must be devised which would avoid the first-come, first-served scenario, which is anathema to bankruptcy, and would fairly allocate the insufficient funds among the people holding allowed claims. *See, e.g.,* Part VI., *infra* pp. 598–603.

54. As noted earlier, *supra* note 18, it is possible for a plan to classify commercial claims and tort claims separately.

55. *Future tort claims problems come in all shapes and sizes.* On one extreme, a court was faced with the problem of dealing with claims of people who had not yet even encountered the debtor's product. In *Epstein v. Official Comm. of Unsecured Creditors, (In re Piper Aircraft Corp.),* 58 F.3d 1573 (11th Cir.1995), the issue arose from the statistical probability that airplanes manufactured by the debtor would on various unknowable days in the future fall from the sky and injure or kill various persons whose identities were likewise presently unknowable. Not surprisingly, the court held that such speculative claims were too attenuated to be cognizable within bankruptcy. *Id.* at 1578.

A step removed is the classic future claims problem encountered in the asbestos cases. In those cases, future claimants were defined as people who, whether knowingly or not, had al-

## B. Approach of Prior Mass Tort Bankruptcy Cases

In attempting to deal with the claims liquidation process, mass tort bankruptcies have employed what is essentially the same methodology. First, the court estimates the aggregate value of all pending unliquidated tort claims, both present and future. Second, funds sufficient to pay the estimated amount of liability are placed into a trust account that is established as part of the plan of reorganization. Third, trust administrators are assigned the task of actually determining the value of and subsequently paying individual tort claims. The appropriateness of employing the traditional model in this or any other case requires further examination.

The failure of the traditional model, which was first crafted in *Johns–Manville*, is widely recognized.[56] Indeed, that court basically conceded as much with respect to the original plan. *See Findley v. Blinken (In re Joint Eastern and Southern Dists. Asbestos Litig.)*, 129 B.R. 710, 754–62 (E. & S.D.N.Y.

1991), *vacated,* 982 F.2d 721 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir.1993). In that case, a trust account initially funded with over $2.5 billion plus stock was all but empty after only two years of operation. *Id.* at 752. The plan of reorganization, and thus the adequacy of trust funding, was based upon an estimate that utilized the following assumptions: There would be no more than 100,000 claims; and each of those claims had a present value of $25,000. *Id.* at 755. Yet, trust administrators routinely liquidated present claims in amounts far in excess of the $25,000 projection. *Id.* at 758. The situation was further complicated due to the fact that by its second year, the number of actual claims filed against the trust vastly exceeded the projected number. *Id.* As a result, the trust was administered in a manner that made achieving a fair distribution among present claimants impossible. Because even present claimants were being shortchanged, future claimants were even more egregiously harmed.

---

ready been exposed to the debtor's product, but who had not yet manifested symptoms of an asbestos-related disease. *See, e.g., Findley v. Blinken*, 982 F.2d at 725; *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir.1985).

In this case, however, the problem is less severe. All who have received a breast implant are cognizable of this fact. The Court, therefore, previously held that there was no need for a so-called "legal representative of future breast implant claimants." It has been the consistent view of the official committee representing all tort claimants that "any person who has received a silicone-gel breast implant manufactured by the Debtor or from components supplied by the Debtor, has already suffered an injury and is therefore a present, as opposed to a future claimant. By this reasoning, since the Debtor is no longer manufacturing this product, there can be no 'future breast implant claimant'." Order Dismissing Motion of Alan B. Morrison for Appointment as the Legal Representative of Future Breast Implant Claimants, Oct. 10, 1995.

Despite this previous ruling, it is important not to over-simplify the posture of tort claims in this case. For while there are no future claimants here, there may nonetheless be claims whose parameters will not be known for a number of years. That is, some persons who have filed proofs of claim did so without having experienced any untoward symptoms from exposure to silicone-gel breast implants. Moreover, at this time certain tort claimants allege only nondisease-related injuries. Nonetheless, the TCC and others assert that these nondisease claimants stand a chance of acquiring a silicone-caused

disease at some point in the future. In this sense, then, some present claimants may possess claims whose true parameters may only become known after a plan is confirmed. *Cf.* Ralph R. Mabey and Jamie Andra Gavin, *Constitutional Limitations on the Discharge of Future Claims in Bankruptcy,* 44 S.C. L.Rev. 745, 749–50 (1993) (defining a future claim as "a claim against a debtor for an injury or disease that has not as yet become manifest at the time the debtor has filed for bankruptcy, but is based upon the occurrence, prior to the bankruptcy, of one or more material events, acts, or failures to act" involving the debtor).

**56.** A partial list of the numerous commentators who have criticized the poor result of the *Johns–Manville* reorganization includes: Richard B. Sobol, *Bending the Law: The Story of the Dalkon Shield Bankruptcy,* 57–58, 341 (1991); Frank J. Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future,* 17 Cardozo L.Rev. 583 (1996) (discussing the complete failure of the *Johns–Manville* trust to fairly distribute funds to tort claimants); Coffee, 95 Colum. L.Rev. at 1387 (noting how *Johns–Manville* trust funds were distributed in such a way so as to leave future claimants "empty-handed"); Thomas A. Smith, *A Capital Markets Approach to Mass Tort Bankruptcy,* 104 Yale L.J. 367, 368–70 (1994) (observing that the structure of the *Johns–Manville* trust unfairly favored present claimants); Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (Or Found)?,* 61 Fordham L.Rev. 617, 655–56 (Dec.1992).

Another mass tort case, *A.H. Robins,* significantly modified the *Johns–Manville* approach. In *A.H. Robins,* tort claimants were given a choice of options through which they could liquidate their claims. *See* Vairo, 61 Fordham L.Rev. at 630–31. Each succeeding option held the promise of higher recovery, but also placed increasingly difficult procedural and substantive hurdles in the way of recovery. Sobol, *Bending the Law* at 309–25.

In an article discussing the *A.H. Robins* reorganization, Kenneth R. Feinberg extolled its apparently successful outcome. *The Dalkon Shield Claimants Trust,* 53 Law & Contemp. Probs. 79 (Autumn, 1990).[57] But even within his article that is so favorable to the form of plan confirmed in *Robins,* Feinberg acknowledged its serious fundamental flaw. When he wrote the article, the final results of that case were not yet in. He, therefore, included a quiet caveat to his otherwise lavish praise. For the *Robins* plan to prove successful in the long run, the court's estimated value of tort claims had to be correct. As Feinberg stated:

> The accuracy of the court's estimate of the aggregate value of the claims will be put to the test [during the Option 3 process]. The aggregate estimate necessarily included assumptions about the number of claimants who would pursue claims beyond Options 1 and 2. Should fewer individuals than expected resolve their claims under Options 1 and 2, the Trust may face the possibility that insufficient funds will be available to administer and pay Option 3

claims. Whether the Trust can manage the Option 3 claims process in a cost effective and timely manner depends to a large extent on the Trust's success in resolving claims under Option 2.

Feinberg, 53 Law & Contemp. Probs. at 109.

These cases demonstrate that for the traditional mass tort bankruptcy model to succeed in fairly allocating the limited funds set aside for all claimants, the judge must accurately—at least within an adequate margin for error—estimate the aggregate amount of all claims—including those of persons presently suffering severe disability, those with mild current symptoms but with exacerbation a reasonable concern, and those with no symptoms whatsoever, but who nonetheless may develop symptoms at some unknown point in the future. Furthermore, in most such cases, it is known that only some of the population of persons exposed to the product will ever experience symptoms.[58]

The *A.H. Robins* approach only complicates the estimation process because it requires the court to answer the following questions: 1) what percent of claimants will opt for quick cash? 2) what percent of claimants will settle during alternative dispute resolution and at what average award? and 3) what percent will assert all of their constitutional, statutory and procedural rights to a jury trial and at what average outcome? In *A.H. Robins* the "experts" differed on their estimation of the final outcome by a factor of

57. The *A.H. Robins* case certainly resembles this one. Both companies were driven into bankruptcy as a result of thousands of lawsuits alleging that a medical implant device marketed to women caused them serious physical harm. Both cases involved the vilification of management for concealing the allegedly harmful effects of the devices. In both, substantially all the implantees knew they were implanted with the company's product, so the unknown exposure problem existing in the asbestos cases did not unduly complicate matters. It is, therefore, not surprising that Feinberg, a one-time trustee for the Robins Claimants' Trust, and one who expressed such satisfaction with the results achieved in that case, would, as part of the Debtor's team, assist in proposing a similar plan of reorganization.

58. Since the injuries that may occur to some claimants have not yet manifested, placing a total dollar value on such claims becomes a herculean task. "[T]he problem of valuing the tort claims is likely to far overshadow ordinary problems of firm valuation." Mark J. Roe, *Bankruptcy and Mass Tort,* 84 Colum. L.Rev. 846, 853 (1984). And the "ordinary problems of firm valuation" are daunting enough. *See, e.g., Official Creditors' Comm. v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.),* 781 F.2d 99, 104 (7th Cir. 1986) ("The valuation of a corporate debtor is a complex task...."); *Citibank, N.A. v. Baer,* 651 F.2d 1341, 1347 (10th Cir.1980); *In re BMW Group I, Ltd.,* 168 B.R. 731, 737–38 (Bankr. W.D.Okla.1994) (quoting Elizabeth Warren, *A Theory of Absolute Priority,* 1991 Ann. Surv. Am. L. 9 (Feb.1992)); *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1008–09 (Bankr.D.Mass.1991).

almost 1200%.[59] This fact alone suggests that if the court's estimation in *A.H. Robins* ultimately turns out to be accurate it would truly be a miracle.[60] Even the disclosure statement which accompanied the plan that was ultimately confirmed in *A.H. Robins* warned that:

> [e]stimation is not an exact science. The money available to pay Dalkon Shield claims may prove to be more or less than the actual value of such claims. If the estimation decision underestimated the value of the claims, there may not be enough money for the Claimants Trust to pay all claims in full.

*Menard-Sanford v. Mabey,* 880 F.2d at 697.

For the reasons discussed in Part IV., *supra* pp. 562–574, the Court determined that the extremely broad form of estimation of the type sought by the Debtor and TCC is not appropriate at this juncture. Consequently, we need not be concerned with the problems that can arise from an inaccurate estimation.[61] However, this does not mean that we are spared having to deal with the fair distribution dilemma.

Even if a court refuses to estimate the aggregate value of tort claims, if a claimants' trust fund is established by consensual plan and the trust administrators are burdened with liquidating the claims as was the case in

previous mass tort bankruptcies, the problem of fairly disbursing those funds still exists. Whether a court estimates the fund necessary to fully compensate unliquidated tort claims or the amount of the fund is fixed by agreement, it will be necessary periodically to estimate the remaining claims until the funds are exhausted. Unless the difficulty of doing this is somehow eliminated by the design of the plan, the same factors that make it difficult for the Court to accurately estimate the aggregate value of tort claims will make it difficult for trust administrators to do so.

Professor Smith asserted that the ability of trust administrators to accurately estimate the aggregate value of tort claims is inhibited by the fact that "current mass tort bankruptcy practice favors present claimants over future claimants." Smith, 104 Yale L.J. at 382. "[F]avoring present over future claimants is mere bias." *Id.* at 384 n. 62. But this bias in favor of present claimants is to be expected because it is consistent with human nature. Roe, 84 Colum. L.Rev. at 854 ("Our society has often been quite willing to spend comparatively large sums to save the current, identifiable victim while underfunding efforts to save the future, statistical victim.... Whatever the explanation, the phenomenon is difficult to deny.") Confronted with sick and dying present tort claimants, trust adminis-

---

**59.** "[T]he testimony as to the estimated recovery value of the Dalkon Shield claims ranged from $600 million to $7 billion dollars." *Menard-Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694, 699 (4th Cir.), *cert. denied* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).

**60.** Current reports indicate that the *A.H. Robins* trust funds will indeed be sufficient to pay all claims in full (depending upon one's definition of paid in full). One might be tempted to congratulate the court for its uncanny prognosticating ability. Alternatively, one might dismiss the success of the *A.H. Robins* case as flowing from pure luck and that, as a result, such success is unlikely to be duplicated in subsequent mass tort bankruptcies following the same approach. However, there is perhaps a less flattering explanation to the *A.H. Robins* success story that, as one commentator has forcefully concluded, has little to do with either a skillful estimation or the fortuitous intervention of luck. Sobol, *Bending the Law.*

Despite the fact that determining the value of pending tort claims was unquestionably the most

important issue in the case, the court never explained its reasoning for the estimation decision. *Id.* at 197; *see also* Fed. R. Bankr.P. 7052 (requiring the court to make specific findings of fact and conclusions of law in all disputed matters). In a scathing attack on the subsequent methodologies employed by the *A.H. Robins* court, Sobol asserted that the remainder of the case was carefully engineered by the court to guarantee that the unexplained estimation would, in the end, prove "accurate." *Id.* at 198–342. The court clearly feared that its estimate would not hit the mark as it felt compelled to take extraordinary measures to control the make-up and activities of the purportedly independent Claimants Trust. *Id.* at 287–308; *see also A.H. Robins,* 88 B.R. at 752 (where the court candidly stated that it took control over the independent Trust in order "to assure the accuracy of the Court's estimate").

**61.** We hasten to add that estimation in some form might prove to be necessary. *See* Part IV.E., *supra* pp. 572–573. For example, a consensual plan might provide a role for an estimation.

trators tend to pay these claims more than their *pro rata* share. Smith, 104 Yale L.J. at 383. ("Present claimants in mass tort bankruptcies are identifiable persons with urgent medical and financial needs, while future claimants are only statistical probabilities.").[62] When the injuries of future claimants do manifest, their *pro rata* share of the trust proceeds will have been greatly dissipated.[63] This, of course, was the story of *Johns–Manville*.[64]

The conclusion Professor Smith drew was that trust administrators should not be assigned the onerous task of trying to fairly determine the value of each individual claim. Absent a plan structure making the task considerably easier, there is a serious question as to whether a trust administrator can adequately factor in the injuries that may some day manifest in what are now perfectly healthy people when determining the amount that should be paid to presently ill claimants. Professor Smith believes that when trust ad-

ministrators are given this responsibility, there are simply too many human factors coming into play that distort the payment scheme and make *pro rata* distribution more difficult to achieve.[65] Broad, generic estimation of the aggregate value of a large class of unliquidated tort claims is a task to be avoided, whether that estimate is done by a court, a group of trust administrators, or both.

## C. A View Toward Achieving a Fair Distribution

The task of achieving a fair distribution of assets in the mass tort setting is onerous and profound. And, of course, criticizing flawed approaches to an incredibly difficult problem is easy. The hard part is coming up with a better model. It is our fervent hope that the parties achieve a fair distribution through settlement or mutual agreement upon a process for resolving the case. However, a consensual resolution to this highly charged case has always seemed unlikely. Consequently,

62. Professor Smith cited additional factors which can undoubtedly contribute to the overpayment of present tort claimants. *See* Smith, 104 Yale L.J. at 384–389 & 392 n. 90 & 399 n. 105.

63. One can nevertheless hypothesize cross-currents of human nature which would penalize present claimants over future claimants. A person representing a claimants' trust in discussions with an individual claimant over a fair settlement of the claim should, if she views herself as a "trustee," attempt to be impartial and not try to "protect" the funds in trust. But, if the trust's representative is aware that the $100,000 she is about to offer to the claimant across the desk from her is the last $100,000 held by the trust, she might legitimately worry about how the 20 other claimants waiting outside her office that day will be compensated. This tension could cause her to low-ball the offer to the claimant in front of her. According to some, this is exactly what happened in the *A.H. Robins* case. *See* Sobol, *Bending the Law*. About the only reasonable means to counteract this tension is to keep the knowledge of the trust's finances from the people negotiating claimants' settlements.

But even if the roles of financial trustees and the trust's claims liquidators are separated, the impossibility of achieving a fair distribution to tens or hundreds of thousands of claimants against a fixed fund still exists. Assume that the liquidators and the first 10,000 claimants are lucky enough to have agreed upon the "proper," independent value of each claim. If the fund turns out to be inadequate, as in *Johns–Manville*, the thousands at the end of the queue will receive

nothing. In that case, one might argue that keeping the liquidators knowledgeable of the trust's finances, which in turn pressures them to coerce lower settlements to those in the front of the queue so that all claimants will at least receive something, might be preferable.

Either way, the administrators of a traditionally-styled claimants' trust would seem to be in a no-win situation.

64. As previously noted, the Court recognizes that any future claims problems that may exist here are not as severe as those that were present in *Johns–Manville*. Nonetheless, if we were to follow the traditional mass tort bankruptcy model, fair distribution problems could still occur. Fortunately, there are proposals for achieving a fair distribution of a debtor's assets in a mass tort bankruptcy case flexible enough to be applied to a broad spectrum of future claims problems ranging from the *Johns–Manville* scenario to the less extreme problems faced in this case. *See, e.g.*, Smith, 104 Yale L.J. 367.

65. In fact, Professor Smith was of the opinion that the trust administrators should have nothing to do with liquidating individual tort claims. In his view, their role should be strictly ministerial. Smith, 104 Yale L.J. at 397. Not only would trust administrators assigned the task of defending tort claims possess inescapable biases and conflicts, *see supra* notes 62–63 and accompanying text, but their motivation in mounting a proper defense could be suspect. It would be better if the entity having the strongest interest in mounting a vigorous defense be assigned that role.

from the early days of these proceedings, the Court has encouraged the parties to think creatively, to search the academic literature for new ideas and to not be afraid to try them. We again encourage the parties to try something new and better. Commentators have proposed innovative approaches to the dilemma that, while perhaps not perfect, could prove to be a substantial improvement over existing models. We hesitate to finely examine these novel proposals lest it seem that the Court has latched onto one or another of them as the "preferred" methodology. However, we strongly encourage the parties to review the literature cited in this Opinion, especially the article by Professor Smith, *A Capital Markets Approach to Mass Tort Bankruptcy,* 104 Yale L.J. 367 (1994). Consideration of some of these proposals, or variations thereof, if implemented, could assist the parties in reaching a fair and expeditious resolution of these proceedings.

### VII. Recapitulation

For the reasons stated above, the Court will enter an order denying both motions for estimation and the Debtor's motion for the appointment of a panel of experts at this time.[66] This Court is about to consider the Debtor's omnibus objections to tort claims. The Debtor has asked this Court to rule as a matter of law that the tort claimants cannot present evidence which would satisfy the *Daubert* test and, therefore, their claims should be disallowed by summary judgment. Assuming that such a motion is denied, that the Court ultimately concludes that a consensual plan is unlikely to emerge, and that litigation over the allowance of tort claims is inevitable, we will ask the district court to commence the process of liquidating these claims in the manner we suggest. At such time, the Court will forward this Opinion to the District Court as a formal report and recommendation. An appropriate order will be entered.

---

**66.** Any party may again seek the appointment of experts pursuant to F.R.E. 706 at an appropriate time, say, when and if liquidation of the claims begins in earnest.